No. 27,480.

KATHLEEN RYAN, a Minor, by T. L. RYAN, Her Father and Next Friend, *Appellee*, v. THE BOARD OF EDUCATION OF THE CITY OF EUREKA et al., *Appellants*.

(257 Pac. 945.)

SYLLABUS BY THE COURT.

SCHOOLS—*Mandamus to Compel Giving of Credit and Issuance of Diploma.* The proceedings considered in an action to compel a board of education to give credits and issue diplomas to a student in the high school, and *held,* the relief prayed for was properly granted.

Appeal from Greenwood district court, division No. 2; GEORGE J. BENSON, judge. Opinion filed July 9, 1927. Affirmed.

*Gordon A. Badger* and *Robert H. Clogston,* both of Eureka, for the appellants.

*W. C. Harris* and *O. S. Samuel,* both of Emporia, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one of mandamus to compel the board of education of the city of Eureka to give credits and to issue diplomas to a student in the high school. The writ was allowed, and the board appeals.

The school system was organized in the usual way. C. U. Phillips was superintendent of schools. H. O. Le Grande was principal of the high school. Edith Walker was instructor in history. Kathleen Ryan entered the high school as a freshman in 1922, completed the successive courses of study, and was enrolled as a member of the senior class of 1925-'26. Her senior-year studies were physics, algebra, Latin, American history, journalism, and harmony and piano. Extra tuition was charged for the music course. On May 18, 1926, the day before commencement, the final examination in American

Mandamus, 38 C. J. pp. 692 n. 10, 736 n. 15. Schools and School Districts, 35 Cyc. p. 1140 n. 50.

history occurred. While the examination was in progress Miss Walker discovered a paper in Kathleen's possession containing notes on American history. A rule forbade possession of books or papers during examination. Kathleen was told she need not proceed further, and was denied credit in American history. Without that credit her record would show the high-school course was not completed, and she was denied a diploma. When her deposition was taken previous to the trial, which occurred on November 16, 1926, she testified she was seventeen years old.

The law governing the examination was promulgated by the principal of the high school, and read as follows:

"Please read to each group before the examination:

"1. There must not be any books or papers in possession of anyone during the examination.

"2. Any one known to give or receive help in any way will themselves receive zero in the examination."

A copy of these rules came into the hands of Miss Walker just previous to the beginning of the school year 1925-'26, and previous to the first examination held after school commenced she read the rules to all students in her classroom, including Kathleen.

The answer of the board of education pleaded, in terms suggesting indictment by grand jury for felony, that Kathleen willfully and wrongfully and with intent and purpose to receive aid from certain data pertaining to the examination in American history, took such data with her to the classroom, and had it with her during the examination, in violation of the rules and regulations concerning the examination.

Kathleen made some notes on American history on a full-size sheet of theme paper, and went to school expecting to use the notes for review before the examination commenced. The examination commenced at once, and students were directed to deposit their books in a designated place. Kathleen folded the sheet, placed it in her history text, and deposited the book as directed. She testified that later she went to the book for her blotter. The sheet fell out, and she folded it in the blotter, took it to her desk, and placed it under her ink bottle, where she testified it remained until Miss Walker took possession of it. Miss Walker testified to finding the paper inside the blotter on top of Kathleen's desk. She said her attention was directed to the desk by the fact that Kathleen had a piece of

Ryan v. Board of Education.

half-closed paper in her lap, and had her eyes directed downward and peering into it. The rule forbade possession, and Kathleen was guilty of possession. Rule 1 attached no penalty for mere possession of papers.

There was no allegation in the answer of the board that Kathleen did in fact derive any help from the data. Evidence bearing on the subject was introduced at the trial. Kathleen's explanation of possession precluded receiving help from the paper. Miss Walker testified she did not know that Kathleen read from the paper. Kathleen's father testified Miss Walker told him there seemed to be doubt about whether Kathleen cheated, and she ought to have the benefit of the doubt. Miss Walker testified she did not use the word "cheated," and doubtless Kathleen's father testified to the substance and not to the precise words used in the conversation. The case was presented to the superintendent of schools by Miss Walker and Kathleen. He testified it was not clear to his mind that Kathleen cheated. The district court was authorized to find that receiving help from the paper was not established. The general finding in Kathleen's favor includes such a finding, the penalty prescribed for violation of the second rule was not incurred, and a grade of zero for that examination was not authorized.

Presumably to show disposition to cheat, and to degrade her, Kathleen's record was searched and was exposed by the board. The Latin class was reading Cicero. A member of the class spent her Christmas vacation translating in advance. One day her book and notes were borrowed by Kathleen and another girl, who used the notes in recitation. They were given zero for that day's recitation. Whether the notes were abated as a common nuisance because the owner had voluntarily parted with possession and they were used as a vehicle for transportation of illicit information, does not appear. But the incident raises in the court's mind a question in American history: What became of the interlinear literal translations of the Latin texts that were available for use, under necessity's sharp pinch, in the days when Christmas vacations were used, if at all, for making up and not for getting ahead, and when—

On reflection, the court will drop that subject as incompetent, irrelevant and immaterial.

On another occasion, during a daily examination in which every-

one took some part, Kathleen's eyes wandered to the desk of another student on which lay an examination paper.

The objects of an examination were enumerated by Dr. A. Lawrence Lowell, president of Harvard university, as follows: "1, to measure progress of the pupil; 2, as a direct means of education; 3, to set a standard for achievement."

The rules did not deal specifically with wandering eyes. If just letting the eyes wander across the aisle to another paper should stimulate thought, perhaps it might be construed as receiving help. If there were an expression of distress or yearning in the eyes, which might occur once in a four years' high-school course, perhaps it might be construed as an attempt. But in case a boy or girl were nonplussed by some examination question, might not wandering of the eyes toward a neighbor's paper help to achieve Doctor Lowell's object No. 2?

Miss Walker ordered Kathleen to report to the principal, and delivered Kathleen's notes to the principal, who put them in his files. A photostatic copy is attached to the abstract. It contains a statement, in proper order, of President Wilson's famous fourteen points, and will be preserved in the archives of this court for reference by those who may, as the years go by, become rusty on the subject. After hearing what Kathleen and Miss Walker had to say of the incident, the principal considered the matter was too serious for him to decide alone, and he called a meeting of the high-school faculty. The meeting occurred in the forenoon of commencement day. Kathleen and Miss Walker made statements, and at the conclusion of the statements the faculty voted fourteen to one to enforce the rule which required that Kathleen be given zero on the examination. But that was not all. The girl cheated, or at least she was suspected of cheating. Other girls and boys might think about cheating sometime, in spite of the law, and one way to guide the adventurous footsteps of confident immaturity is to terrify by horrible example. It is true this method does not always work. Thus in the original home of our Puritan ancestors pocket-picking was at one time punished by hanging. More pockets were picked at a hanging than on any other holiday; and in other instances brutality has defeated its own ends. The method, however, has antiquity in its favor. It was employed in the dark ages, and the faculty voted to deprive Kathleen of all credit in American history

Ryan v. Board of Education.

for the entire year. But that was not all. Kathleen had finished the course in music, and gave the graduating recital in that course. Credit in music depended on credit in American history, and her music credit was automatically forfeited. Madame Roland's memorable apostrophe to Liberty might well be addressed to Virtue.

Of course, one who had eaten forbidden fruit could not be allowed to mingle with the righteous members of her class, and the teacher who had charge of the class-day program performed the office of the angel with the flaming sword at the gate of Kathleen's lost Eden. When Kathleen, for reasons which will presently appear, insisted on taking part, the teacher would have nothing more to do with the contaminated exercises, and left the building.

The single vote against the vindictive action of the faculty meeting was cast by Miss Walker. The principal reported to the superintendent in writing as follows:

"At a meeting of the high-school teachers this morning, it was decided by vote of fourteen to one to refuse to allow Kathleen Ryan any credit in American history for the past year. The cause of this decision was the result of her having been caught cheating in the final examination yesterday afternoon. This plan of disallowing credit in such cases is, the faculty believes, quite universal. This means that she has failed in a subject required in all courses for graduation."

Whether Kathleen knew anything of the widely heralded revolt of modern youth, we do not know, but she appealed to the superintendent. After the superintendent received the communication from the principal, he listened to Kathleen and Miss Walker, and directed Miss Walker to give Kathleen another examination. The examination was given, but the principal directed Miss Walker not to record the grade. Mr. Ryan testified the principal told him she passed, the principal said he did not remember the grade, but it was a passing grade. The principal denied making these statements. The question of veracity was one for the district court to determine, and the court made an express finding that Kathleen had received a passing grade.

At this point, disgraced and humiliated, Kathleen Ryan, just a high-school girl, who had not yet learned what many a boy and girl does not learn until late in college life, or even later—that veracity of thought and veracity of action are best, even under great temptation—goes out of the picture.

The second examination was commenced about 2:30 in the after-

noon. News of it got abroad, and the faculty held another meeting. As a result of the meeting, the following naive communication, signed by all the members of the faculty, was sent to the school board:

"We, the undersigned, protest against the action of the superintendent in overruling the decision of the faculty in the Ryan controversy. We feel that this type of administration is not conducive to an orderly school system. We ask that the action taken by the faculty this morning be upheld by the board of education, and Kathleen Ryan be not permitted to appear with the graduating class to-night."

Commencement exercises were to begin at eight. There were six members of the board, and four of them held a meeting at 6:30. Kathleen was not present or represented. One of the members of the board testified he did not know whether presence of Kathleen's papers in the classroom was accidental or not; the object of the meeting was to back up Mr. Le Grande and the faculty, and to over-rule Mr. Phillips, the superintendent. Another member of the board told Mr. Ryan the faculty said if Kathleen were allowed to graduate they would all resign, and so he thought he would stand up for the faculty.

When the members of the senior class assembled, in the midst of flowers and to strains of music, for the greatest event in their lives up to that time, and received their diplomas in the presence of an audience composed of proud parents and admiring friends, Kathleen Ryan was denied hers.

Children as a class do not develop uniformly in body, mind or moral apprehension. Self-mastery is seldom fully attained at high-school age. Some are a long time putting away childish things. But their peccadillos and delinquencies are not crimes, and the method of dealing with them is to cultivate in them the wider view, not to apply the branding iron to their foreheads and banish them as outlaws while they still think and speak and understand as children. Superintendent Phillips evidently understands youth, sympathizes with it, and has that faith in its ultimately reaching sound maturity which must sustain all educational endeavor, or the effort is mis-spent. When asked why he gave Kathleen permission to take another examination, he said: "She was an adolescent girl and deserved recognition."

All the board of education did was to overrule the head of the schools, at the behest of a mutinous faculty who had imposed an

outrageous *ex post facto* penalty upon a student who had not vio-
lated the only rule read to her providing a penalty. This was done
without a hearing, without consideration of her guilt or innocence
of fault, and without knowing whether she had completed the course.
It is not necessary to debate legality of such action.

The findings of the district court that Kathleen was entitled to a
passing grade in American history, that she completed the high-
school course of study and was entitled to a diploma, and that she
completed the course in music and was entitled to her credits in that
course and a diploma, are sustained by the evidence, and the judg-
ment based on those findings is affirmed. The cause is remanded,
however, in order that the district court may fix a time in which the
credits may be entered on the high-school records, certificates of
such credits may be furnished to plaintiff, and diplomas may be
executed and delivered to her.

HOPKINS, J. (dissenting): In my judgment the facts do not
warrant much that is said in the majority opinion nor the conclusion
at which the court has arrived.

The issues are clear; the facts simple. Plaintiff was a student
in the Eureka high school. The rules provided substantially that
"there must not be any books or papers in possession of anyone
during the examination; that anyone known to give or receive help
in any way would themselves receive zero in the examination; that
any student receiving information during an examination should
receive zero in the subject." Notwithstanding the rules, plaintiff
carried to the classroom, folded in a blotter, a set of notes covering
the entire subject of American history. She was observed by the
teacher referring thereto and directed to proceed no further with the
examination. The incident was reported to the principal, to whom
the plaintiff made explanation. The superintendent and principal
did not agree. The superintendent directed that plaintiff be given a
second examination, but her papers were not graded. A meeting of
the faculty was called, before whom plaintiff appeared and made
explanation of her possession of the notes, claiming it was accidental.
The faculty took the matter under consideration and decided that
under the rules she was entitled to no grade in American history.
The matter was referred to the board of education which, after due
consideration, upheld the view of the faculty. Without a grade in

American history, plaintiff did not have sufficient credits to graduate. She then brought this action in mandamus to compel the board of education to issue her a diploma. The court substituted its judgment for the judgment of the board of education and directed issuance of a diploma showing plaintiff had graduated, notwithstanding the faculty and board of education had passed adversely upon her right to such a diploma, and notwithstanding that under the rules of the school her grades were not sufficient to permit her graduation.

Under the circumstances there is no substantial reason for substitution of the court's judgment for that of the faculty and board of education, and indeed such action is contrary to the rule of law announced by this court. There was no charge of bad faith on the part of the defendants and none found by the court.

"The control of the city schools . . . is devolved by the legislature upon the board of education. The discretion committed to that body is to be exercised . . . untrammeled by judicial interference. Its judgment, and not that of the court's, must determine the proper solution of the practical questions of administration that continually arise. Its decisions must be final except when the action is capricious or arbitrary." (*Williams v. Parsons,* 81 Kan. 593, 594, 106 Pac. 36.)

In addition, it may be noted that mandamus will not lie except to compel the performance of a plain legal duty. (38 C. J. 692.) No such plain legal duty was shown. What was determined by the supreme court of Iowa is applicable here.

"The fundamental difficulty with plaintiff's case lies in the fact that no one is able to put his finger upon a statute which compels the defendants, as a legal duty, to deliver to the plaintiff a diploma. We have looked them over with care, and find no such provision anywhere in our laws. This being true, it is manifest that no action of mandamus will lie. It has been decided in numerous cases that it will not lie unless the respondent has some legal duty to perform, and we need not do more than cite, in addition to Ford's case, *supra, Drew v. School Township,* 146 Ia. 721. . . . As no legal duty to issue diplomas was ever made by any law, the remedy by mandamus will not lie." (*Sweitzer v. Fisher,* 172 Ia. 266, 273.)

It is a gross mistake to require a board of education to issue a diploma to a student who is not entitled thereto under the rules of the school. Such a policy is injurious to the discipline of the schools; is unjust to other students who comply with the rules and make their grades in the proper way; is unfair and will prove unfortunate to the student himself whose success is achieved in such a manner.