No. 35,546

THE STATE OF KANSAS, *Appellee,* v. MR. AND MRS. J. ALFRED SMITH, *Appellants.*

No. 35,547

THE STATE OF KANSAS, *Appellee,* v. MR. AND MRS. OLIE GRIGGSBY, *Appellants.*

(127 P. 2d 518)

Opinion filed July 11, 1942.

*C. J. Evans,* of Topeka, argued the cause, and *R. A. Mooneyham,* of Carthage, Mo., and *Hayden C. Covington,* of Brooklyn, N. Y., were on the briefs for the appellants.

*Jay S. Parker,* attorney general, *H. Lloyd Ericsson,* assistant attorney general, *Harry L. Porter,* county attorney, and *C. E. Shouse,* deputy county attorney, were on the briefs for the appellee.

*Edward Rooney,* of Topeka, was on the briefs as *amicus curiae.*

The opinion of the court was delivered by

HARVEY, J.: Appellants in each of these cases were charged with violating the truancy law of our state (G. S. 1935, 72-4801, 72-4802),

were found guilty, and have appealed. The cases were tried separately in the courts below, first in the juvenile court and on appeal in the district court, but have been consolidated here, for the legal questions presented are the same in each case. The pertinent portion of G. S. 1935, 72-4801, reads:

"That every parent, . . . having control over or charge of any child who has reached the age of seven years and is under the age of sixteen years, shall require such child to attend continuously a public school or a private, denominational or parochial school taught by a competent instructor, . . . each school year, for such period as the public school of the district in which the child resides is in session: . . ."

Section 72-4802 provides the procedure for the enforcement of the act by the county superintendent and truant officers appointed by him through proceedings in juvenile court, provides penalties for those found guilty of violating the act, and makes it the duty of the county attorney to investigate complaints filed and to prosecute any action brought under the act.

In 1907 our legislature passed an act (Laws 1907, ch. 319) entitled "An act to provide for the display of the United States flag on the schoolhouses of the state, in connection with the public schools, and to encourage patriotic exercises in such schools." Section 1 of the act made it the duty of the school authorities of every public school to purchase a suitable United States flag, flag staff, and other necessary appliances, and to display the flag upon, near, or in the school building during school hours, and at such other times as the authorities might direct. This section was amended in 1919 (Laws 1919, ch. 274, § 2) so as to apply to public, private and parochial schools, and is now G. S. 1935, 72-5305, and a section was added making it the duty of the county superintendent to notify the school authorities of the provisions of the statute and making it a misdemeanor, punishable by a fine, for such authorities not to comply with the statute within thirty days after such notice. (G. S. 1935, 72-5307, repealed by Laws 1939, ch. 309, new act; see G. S. 1941 Supp. 73-710.)

Section 2 of the act authorized the school authorities to establish rules and regulations for the custody, care and display of the flag, and when the weather would not permit it to be otherwise displayed, to have it placed conspicuously in the principal room of the schoolhouse. This section was rewritten by the 1919 act and is now G. S. 1935, 72-5306.

Section 3 of the act, now G. S. 1935, 72-5308, reads as follows:

"It shall be the duty of the state superintendent of public instruction of this state to prepare for the use of the public schools of the state a program providing for a salute to the flag at the opening of each day of school, and such other patriotic exercises as may be deemed by him to be expedient, under such regulations and instructions as may best meet the varied requirements of the different grades in such schools. It shall also be his duty to make special provision for the observance in such public schools of Lincoln's birthday, Washington's birthday, Memorial day (May 30), and Flag day (June 14), and such other legal holidays of like character as may be hereafter designated by law."

The "Manual of Patriotic Instruction," (1935) prepared by the state superintendent of public instruction and now in general use, contains 287 pages. Several pages are devoted to the flag, how to display it, and the flag code. Attention is called to the decision of the United States supreme court in *Halter v. Nebraska,* 205 U. S. 34, 27 S. Ct. 420, upholding a Nebraska statute identical with our G. S. 1935, 21-1301, providing penalties for the unlawful acts respecting the United States flag, and recommendations were made for subsequent legislation. The manual contains much patriotic instruction of a general character and for many special days and occasions. On page 17 it is said:

"Salute When Giving the Pledge

"In pledging allegiance to the flag of the United States of America, the approved practice in schools, which is suitable also for civilian adults, is as follows:

"Standing with the right hand over the heart, all repeat together the following pledge:

"I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands: One Nation, indivisible, with liberty and justice for all.

"At the words 'to the flag,' the right hand is extended, palm upward, toward the flag and this position is held until the end, when the hand, after the words 'justice for all,' drops to the side."

Appellants in these cases are religious people, students of the Bible and members of the sect commonly known as Jehovah's Witnesses. In the tenets of their faith reliance is especially placed in the following verses from the 20th chapter of Exodus:

"3 Thou shalt have no other gods before me.

"4 Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water under the earth:

"5 Thou shalt not bow down thyself to them, nor serve them: . . ."

According to their belief the flag is a graven image; to worship it is a violation of the command of God and would condemn them. They have brought their children up in their faith. We need not enlarge upon their beliefs, for it is conceded in the briefs of appellee that appellants and their children are sincere in their religious beliefs.

Mr. and Mrs. Smith, appellants in No. 35,546, live in the Lawton school district in Cherokee county. They have two children of school age, Barbara, nine, and Artye Lee, eight, who had attended the Lawton school four and three years respectively. A witness for the state, who had known Mr. Smith all his life and his wife for perhaps ten years, testified:

"Mr. and Mrs. Smith are considered as industrious, home-loving, law-abiding citizens, by all their neighbors."

Similar testimony was given by other witnesses. They were anxious for their children to attend school. Their children are intelligent, well-behaved, good students, and wanted to go to school.

At the beginning of the term of school September 1, 1941, the members of the school board went to the school and told the teacher to exclude any children from the Lawton school who failed to salute the flag. "We authorized the teacher to exclude the children until they did salute the flag." In previous years patriotic exercises had been conducted at the Lawton school, but it does not appear that at any time previously any penalty was imposed upon any child who did not salute the flag. The first week of school patriotic exercises, including a salute to the flag, were conducted, but the Smith children did not salute the flag. Apparently the school board and the county superintendent were advised of that fact and the teachers instructed to carry out the directions of the board given at the beginning of the school term. On Monday morning of the second week Miss Turrill, principal of the school, to avoid humiliating the children in the presence of other pupils by expelling them, went to the Smith home shortly before school time. Mrs. Smith was preparing the children for school. Miss Turrill showed her a letter which she had received from the county superintendent, which in part stated:

"The United States supreme court in an opinion filed on June 3, 1940, held that it is within the power of a school district board to exact participation in the flag salute ceremony as a condition of children's attendance at school."

The letter referred to and quoted from a letter of the attorney general in which a procedure respecting the matter was suggested (which procedure was not followed) and continued:

"The following facts are apparent: 1. The salute is required by law daily. 2. School boards are authorized to discipline pupils who refuse to give it. 3. Parents are subject to prosecution if refusal is persistent. 4. The Patriotic Manual contains full directions for giving the salute."

Mrs. Smith read the letter and understood it. Miss Turrill gave her to understand that if the children came to school and did not salute the flag they would be sent home. The children did not go to school that day. Conferences were had with the parents and the school board without result. The Smiths employed a well-educated man, who lived at Carthage, Mo., and who held a life certificate from another state, to teach their children privately. This proved to be unsatisfactory to the school authorities because he did not possess a teacher's certificate issued in this state. They then sent their children to school at Columbus, the county seat, but in a few days the school board met and passed a resolution that children must salute the flag if they attended school, and they were sent home. Later the parents got them in school at Parsons, Kan., where they were permitted to attend, and paid their board and tuition there. In the meantime the truant officer filed a complaint against the parents under the compulsory education law. A trial was had in the juvenile court, where they were found guilty. They appealed to the district court, where a trial was had, and they were again found guilty. They raised the question by appropriate motions that our compulsory education statute, as applied to this case, was in violation of the first and fourteenth amendments of the federal constitution and of section 7 of our bill of rights.

Mr. and Mrs. Griggsby, appellants in No. 35,547, resided in the Charter Oak school district of Cherokee county. Their children were expelled from school for the sole reason that they failed to salute the flag. The evidence disclosed that the Griggsbys are good, law-abiding citizens. They testified they respect the flag and taught their children to respect it, but because of their religious views the saluting of the flag would be a sin. Their children were well behaved. The proceedings in their case differ only in details from those in the Smith case.

Counsel for the state cite and rely upon *Minersville District v. Gobitis,* 310 U. S. 586, 60 S. Ct. 1010, 84 L. Ed. 1575, 127 A. L. R. 1493. Obviously, this is the case referred to in the letter of the county superintendent which Miss Turrill gave Mrs. Smith to read. We note, without comment as to its effect, that in the later case of

*Jones v. City of Opelika,* 316 U. S. 584, 62 S. Ct. 1231, 1251, 86 L. Ed. 1174, 1195, which involved a similar question, three of the justices who had concurred in the opinion of the court in the Gobitis case, in a separate opinion stated:

"Since we joined in the opinion in the Gobitis case, we think this is an appropriate occasion to state that we now believe that it was also wrongly decided." (p. 623.)

Aside from that, we think the case is not in point. In the Gobitis case a citizen of Pennsylvania, a member of the religious sect known as Jehovah's Witnesses, whose children had been expelled from a school because they did not salute the flag, brought an action in the federal court to enjoin the authorities from continuing to exact participation in the flag salute ceremony as a condition of his children attending the school, contending the requirement was in violation of the first amendment and the first section of the fourteenth amendment to the federal constitution. The case reached the supreme court, where the question involved was viewed as though the legislature of Pennsylvania had itself formally directed the flag salute for the children of the school district. The court, regarding the first amendment as being included in the fourteenth, section 1, said:

"We must decide whether the requirement of participation in such a ceremony, exacted from a child who refuses upon sincere religious grounds, infringes without due process of law the liberty guaranteed by the fourteenth amendment." (p. 592.)

. The court took note of the fact "that the Congress has not entered the field of legislation here under consideration." The pertinent syllabi, as published in the official publication, 310 U. S. 586, read:

"So far as the federal constitution is concerned, it is within the province of the legislatures and school authorities of the several states to adopt appropriate means to evoke and foster a sentiment of national unity among the children in the public schools.

"This court cannot exercise censorship over the conviction of legislatures that a particular program or exercise will best promote in the minds of children who attend the common schools an attachment to the institutions of their country, nor overrule the local judgment against granting exemptions from observance of such a program."

It will be observed the supreme court treated the regulation in question as being valid under the constitution and statutes of the state of Pennsylvania, and being so, held it was not invalid under

the constitution of the United States. The federal constitutional provisions considered were the first amendment and the first section of the fourteenth amendment. So far as here pertinent these read:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ." (First amendment.)

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (Fourteenth amendment, § 1.)

For many years, even after the adoption of the fourteenth amendment (July 28, 1868) it was held by the supreme court of the United States that the first eight amendments of the constitution, dealing with personal rights, applied only to congress and departments of the federal government, but in more recent years the holdings have been that they are absorbed in section 1 of the fourteenth amendment, and hence are applicable to state laws and their enforcement as well as to the federal statutes and procedure. (See 12 C. J. 941; 16 C. J. S. 600.)

We think the real problem before us is whether regulations of the school boards in question are valid under the constitution and laws of our state. When our constitution became effective, January 29, 1861, there was no federal constitutional provision applicable to the new state respecting freedom of religious beliefs; hence, the framers of our constitution wrote into our bill of rights (section 7) the following:

"The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted, nor any preference be given by law to any religious establishment or mode of worship. No religious test or property qualification shall be required for any office of public trust, nor for any vote at any election, nor shall any person be incompetent to testify on account of religious belief."

It will be observed that the wording of this section of our bill of rights is much more in detail respecting religious freedom than is the first amendment to the federal constitution.

Respecting our bill of rights, in *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, 3 Pac. 284, it was held:

"The bill of rights is something more than a mere collection of glittering

generalities; some of its sections are clear, precise and definite limitations on the powers of the legislature and all other officers and agencies of the state; and while others are largely in the nature of general affirmations of political truths, yet all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm." (Syl. ¶ 1.)

In *Schaake v. Dolley,* 85 Kan. 598, 118 Pac. 80, the court had occasion to consider section 1 of our bill of rights and quote the same, which reads:

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." (p. 600.)

And after discussing its general character it said:

"The result is that the declaration of the bill of rights quoted above is not a prohibition against just restrictions upon the enjoyment of liberty and the pursuit of happiness, in the interest of the public good. It is a political maxim addressed to the wisdom of the legislature and not a limitation upon its power. It is not a mere 'glittering generality' and cannot be entirely disregarded in any valid enactment (see *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.,* 31 Kan. 660, 665, 3 Pac. 284), but it lacks the definiteness, certainty and precision of a rule, like the command of the bill of rights respecting slavery, or religious freedom, or bail, or trial by jury, and consequently cannot, as those provisions do, furnish a basis for the judicial determination of specific controversies." (p. 601.)

At no time in the history of our state have the conscientious religious beliefs of people been restrained, prohibited, or penalized by any statute.

Counsel for the state rely upon article 6, section 2, of our constitution, which reads:

"The legislature shall encourage the promotion of intellectual, moral, scientific and agricultural improvement, by establishing a uniform system of common schools, and schools of a higher grade, embracing normal, preparatory, collegiate and university departments."

Under the direction there given the legislature has been active in providing schools of the various types enumerated for the children and students of our state. These schools are free schools (*Board of Education v. Dick,* 70 Kan. 434, 78 Pac. 812). The general theory of our educational system is that every child in the state, without regard to race, creed, or wealth, shall have the facilities for a free education. The more than five thousand sections of our statutes relating to schools (see G. S. 1935, ch. 72, and 1941 Supp.) are built around this general concept. Our courts have been reluctant to sustain an order expelling a child from school. (See *Osborn v.*

*Russell*, 64 Kan. 507, 68 Pac. 60; *Ryan v. Board of Education*, 124 Kan. 89, 257 Pac. 945; *Nutt v. Board of Education*, 128 Kan. 507, 278 Pac. 1065; *Jacobs v. Templeton*, 130 Kan. 248, 285 Pac. 541.)

When our statute (G. S. 1935, 72-5308) was enacted in 1907, authorizing the state superintendent to prepare for the use of the public schools of the state a program providing patriotic exercises, including the salute to the flag, the legislature did not make the participation in such part of the program as might be objectionable to a student on religious grounds a reason for excluding the child from school. Indeed, it provided no penalty, either as against the state superintendent for failure to outline such a patriotic program, or as against those conducting the schools for the failure to carry it out, or as against a child for failing to participate in it, whatever the reason might be for such failure on the part of any of them. In short, it was not a penalizing statute. As we previously have seen, the same act of the legislature made it the duty of school boards to provide flags and equipment for its display. Obviously, many of them had not done so, and twelve years later the legislature did add a penalty (Laws 1919, ch. 274, § 4, repealed by Laws 1939, ch. 309, new act; see G. S. 1941 Supp. 73-710); but that went only to the proprietors of the school if they failed to get the flags and equipment and to display them on the school grounds or in the schoolhouse after having been notified by the county superintendent to do so, and having failed to comply with the notice after thirty days.

Section 7 of our bill of rights, and article 6, section 2, each being a part of our constitution, must be construed together. While under article 6, section 2, the legislature is required to establish a system of schools, in doing so it cannot violate section 7 of the bill of rights. As we have seen, the legislature has established a system of free schools designed to afford facilities for the education of all the children of the state without regard to their race, creed or wealth. It never has attempted to exclude from our schools any child solely because of the sincere religious beliefs of the child or his parents. In the thirty-four years since the statute (G. S. 1935, 72-5308) was enacted no school board, county, or state superintendent of public instruction ever acted upon the theory that failure of the child to salute the flag, where such failure was based on sincere religious beliefs of the child or his parents, would require or justify the expelling of the child from school. We think the statute never was

designed to be so construed, and if so, to that extent would be void as being in violation of section 7 of our bill of rights. It was not until after the decision of the Gobitis case, *supra*, that the school boards of the districts where appellants' children attended school, in coöperation with the county superintendent of public instruction of Cherokee county, conceived the notion that the failure of such a child to salute the flag justified expelling the child from school. As we have seen, the Gobitis case is not in point. It dealt only with the federal constitutional provisions as applied to a valid state law. Here we have no valid state law for the expelling of a child for such a reason. Indeed, we think no valid state law to that effect could be enacted.

We are not impressed with the suggestion that the religious beliefs of appellants and their children are unreasonable. Perhaps the tenets of many religious sects or denominations would be called reasonable, or unreasonable, depending upon who is speaking. It is enough to know that in fact their beliefs are sincerely religious, and that is conceded by appellee. Their beliefs are formed from the study of the Bible and are not of a kind which prevent them from being good, industrious, home-loving, law-abiding citizens. Upon this point the evidence is clear.

The court holds there is and can be no statute or regulation valid under our constitution which would authorize or justify expelling the children of appellants from school for the sole reason used as a basis for such action in the cases before us.

We think it not necessary to say more. Some cases are cited from other jurisdictions in which varying results have been reached for various reasons stated. It will answer no good purpose to analyze those cases.

From what we have said it necessarily follows the judgments appealed from should be reversed with directions to discharge the appellants. It is so ordered.