The Honorable Henry M. Helgerson, Jr. State Representative, 86th District 4009 Hammond Drive Wichita, Kansas 67218-1221
Dear Representative Helgerson:
You request our opinion regarding whether the school voucher programs proposed in 2000 Senate Bill No. 295 (SB 295), 2000 House Bill No. 2504 (HB 2504), and 2000 House Bill No. 2462 (HB 2462) violate the Establishment Clause of the Constitution of the United States, or the Religious Liberty Clause or Education Article of the Kansas Constitution.
SB 295, HB 2504, and HB 2462 were not presented to the full Legislature for debate. The Bills will not be carried over for consideration during the 2001 legislative session. It is likely, however, that programs similar to those set forth in SB 295, HB 2504, and HB 2462 will be proposed in bills filed for the 2001 legislative session.
SB 295 and HB 2504 contain identical provisions. Under the program proposed in the Bills, a certificate would be issued by the State in the name of an eligible child's parent. The parent would then use the certificate to supplement the tuition required for attendance at an accredited nonpublic school selected by the parent. A nonpublic school could be accredited by the State Board of Education, the North Central Accrediting Association, the Independent Schools Association of the Southwest, the Independent Schools Association of the Central States, the Association of Christian Schools International, the National Lutheran Accreditation Association, or the Seventh Day Adventist Accreditation Association.[1] In order to participate in this program, a school would have to comply with the following requirements: (1) Residency in one of four named school districts in Kansas, (2) participation in the National School Lunch Act for free meals, and (3) ranking below the 40th percentile on nationally normed achievement tests. The program would be limited to 100 students per district.
HB 2462 proposes a program similar to the one set forth in SB 295 and HB 2504. A nonpublic school may be accredited by the State Board or be a private elementary or secondary school as defined at K.S.A. 72-53,101. To be eligible under HB 2462, a child must demonstrate satisfactory academic achievement and qualify under the National School Lunch Act for reduced cost or free meals.
In 1994, this office opined that a similar school voucher program violated the Establishment Clause of the United States Constitution. Subsequently, however, significant new case law regarding the Establishment Clause has developed. The Establishment Clause of the Constitution of the United States, made applicable to the States through the Fourteenth Amendment, provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[2] In Agostini v. Felton,[3] the United States Supreme Court overruled two landmark cases in the church and state area of school law: Aguilar v. Felton[4] and School Dist. of GrandRapids v. Ball.[5] In overturning these cases the Court, while reaffirming the general principles in Lemon v. Kurtzman,[6] reassessed assumptions previously used in evaluating whether governmental aid violated the Establishment Clause:
 "Our more recent cases have undermined the assumptions upon which Ball and Aguilar relied. To be sure, the general principles we use to evaluate whether governmental aid violates the Establishment Clause have not changed since Aguilar was decided."[7]
Even prior to Agostini, the Court conceded that clarity and predictability were sacrificed in order to achieve the flexibility necessary in the Establishment Clause, thereby creating "some of the most perplexing questions to come before [the] Court."[8] The Court's reassessment of Lemon is the rationale underlying the most current exercise of that flexibility.
Since 1973, the general principles used to determine whether governmental action violates the Establishment Clause have been expressed as a three pronged test: (1) the statute must have a secular (i.e. non-ecclesiastical) purpose, (2) the statute must not have the principal or primary effect of advancing or inhibiting religion, and (3) the statute must not foster or result in an excessive entanglement with religion.[9]
The first prong, or "purpose" test, has been interpreted in roughly the same way since it was penned in 1973 and has always been read to include a presumption in favor of constitutionality. This test has been liberally interpreted because courts are "reluctant to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute."[10]
A statute will fail this test only "if it is entirely motivated by a purpose to advance religion."[11]
"A state's decision to defray the cost of educational expenses incurred by parents, regardless of the type of schools their children attend, evidences a purpose that is both secular and understandable. An educated populace is essential to the political and economic health of any community, and a state's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the state's citizenry is well-educated."[12]
By contrast, the understanding of the "effect" and "entanglement" tests has changed. Prior to Agostini, the Court relied on three assumptions when examining whether a statute had a principal or primary effect of advancing or inhibiting religion, only one of which is pertinent to the case at hand.[13] The Court formerly assumed that "any and all public aid that directly aids the educational function of religious schools impermissibly finances religious indoctrination, even if the aid reaches such schools as a consequence of private decision-making."[14]
 Agostini abandoned this assumption.[15] Now, as long as the governmental aid is neutral toward religion, such aid will not be found to have a principal effect of advancing or inhibiting religion. If the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, is made available to both religious and secular beneficiaries on a nondiscriminatory basis, flows to sectarian schools only as a result of numerous private choices of the parents, and does not give recipients any incentive to modify their religious beliefs or practices in order to obtain program services, such governmental aid will be found to withstand constitutional scrutiny.[16] Thus, the Establishment Clause is not violated every time money previously in the possession of a state is conveyed to a religious institution.[17]
Rather, it is a question of degree. "Given that a contrary rule would lead to such absurd results, [the Supreme Court] has consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit."[18] The Establishment Clause was intended to erect a wall of separation between church and state; however, in maintaining this wall, courts must be careful not to "inadvertently prohibit [the government] from extending its general State law benefits to all its citizens without regard to their religious belief."[19]
Regarding the issue of whether a statute fosters "excessive entanglement" with religion, the Court traditionally assumed that any governmental aid or benefit which reaches religious schools automatically creates an excessive entanglement because of the "comprehensive, discriminating, and continuing state surveillance [which] will inevitably be required to ensure that these restrictions [against the inculcation of religious tenets] are obeyed and the First Amendment otherwise respected."[20] Now, however, under Agostini the entanglement between church and state must be excessive before it runs afoul of the Establishment Clause. Additionally, the Court now recognizes "entanglement" as "an aspect of the inquiry into a statute's effect."[21]
In determining the degree of entanglement, the Court will look at the "character and purpose of the benefitted institutions, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority."[22] The Court has stated that "routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no `detailed monitoring and close administrative contact' between secular and religious bodies, does not of itself violate the nonentanglement command."[23] "The State's regulation of participating schools, [which is] designed to ensure that the program's educational purposes are fulfilled, does not approach the level of constitutionally impermissible involvement."[24] If the governmental aid satisfies these criteria, it will be found to withstand the third prong of the Lemon test.
In short, the criteria now applied to evaluate whether governmental aid has the effect of advancing religion are whether the aid results in governmental indoctrination, defines its recipients by reference to religion, or creates an excessive entanglement.[25]
We now review the programs proposed in SB 295, HB 2504, and HB 2462. We have been advised by proponents of these bills that the purpose of the programs is to raise the educational opportunities and achievements of under-privileged elementary and secondary school students. Thus, it is our opinion that a court could find that the programs, as proposed, have a secular purpose.
Assuming the purpose of the proposals is not to advance or inhibit religion, we next review the actual effect of the proposals. The programs do not have the principal or primary effect of advancing or inhibiting religion. The vouchers are allocated to student recipients without reference to religion. The vouchers would be distributed based on neutral, secular criteria that neither favor nor disfavor religion. Additionally, the vouchers would be made available to both religious and secular beneficiaries on a nondiscriminatory basis, and would not give recipients any incentive to modify their religious beliefs or practices in order to obtain program services.
Lastly, the vouchers do not foster an excessive entanglement with religion. The character and purpose of the benefitted institutions are based on educating Kansas children. The governmental aid is money given in the name of the eligible child's parents to the school for the purpose of helping low-income families with tuition in order to allow the parents the private choice of where to send their child to school. In cases where a program was held to foster an excessive entanglement, the government was playing an active role in the day to day operation of the school. For instance, the government instituted a system for monitoring the teachers, thus inserting itself into the administration of a religious authority and allowing itself to monitor the authority's daily actions.[26] Under the programs proposed in SB 295, HB 2504, and HB 2462, the State maintains and distributes information submitted by the schools, receives assurances that admission criteria and tuition are the same, and monitors the academic performance of certificate-eligible children. This creates only minimal entanglement which falls short of the "excessive entanglement" standard.
Based on our analysis of current law as expressed by the United States Supreme Court, we opine that the voucher programs set forth in SB 295, HB 2504, and HB 2462 do not violate the Establishment Clause of the United States Constitution.
This conclusion is consistent with state supreme court decisions that have addressed this issue.[27] Most notably, the Wisconsin Supreme Court held that the amended Milwaukee Parental Choice Program (MPCP), a voucher program very similar to the Kansas Bills discussed herein, did not violate the Establishment Clause because it was found to pass the new understanding of the Lemon test.[28] The Court held that:
 "[T]he amended MPCP, which provides a neutral benefit directly to children of economically disadvantaged families on a religiously-neutral basis, does not run afoul of any of the three primary criteria the [United States Supreme] Court has traditionally used to evaluate whether a state educational assistance program has the purpose or effect of advancing religion. Since the amended MPCP has a secular purpose, does not have the primary effect of advancing religion, and does not create an excessive entanglement, it is not invalid under the Establishment Clause."[29]
However, a law that is federally constitutional may not survive scrutiny under a state's constitution. While a state constitution must be at least as restrictive as the United States Constitution, it may be more restrictive.[30] It has long been understood that "no act of the legislature can be upheld which conflicts with the provisions [of the Kansas Constitution], or trenches upon the political truths which they affirm."[31] Thus, we opined in 1994 that a voucher program such as that proposed in SB 295, HB 2504, and HB 2462 would violate the Kansas Constitution.[32]
The Religious Liberty Clause of the Bill of Rights of the Kansas Constitution provides in part that "[t]he right to worship God according to the dictates of conscience shall never be infringed; nor shall anyperson be compelled to attend or support any form of worship . . . ."[33]
Moreover, Section 6 of Article 6 of the Kansas Constitution provides in part that "[n]o religious sect or sects shall control any part of the public educational funds."
The Kansas Constitution was modeled after the Ohio Constitution at the Wyandotte Constitutional Convention in 1859. However, the Religious Liberty Clause of the Kansas Bill of Rights may actually have been taken from the Indiana Constitution.[34] It has long been a general rule that when a constitutional provision has been borrowed from another state after that state's court of last resort has construed it, that construction is adopted along with the provision.[35] However, neither Ohio's nor Indiana's court of last resort construed the provision prior to 1859 when it was adopted by Kansas.
Ratification of the Fourteenth Amendment to the United States Constitution made federal provisions applicable to the states.[36]
However, the Kansas Constitution was ratified in 1861, seven years before the Fourteenth Amendment was added. Thus, when the Constitution of the State of Kansas was adopted, there was no federal constitutional provision applicable to Kansas respecting religious liberty.[37]
Therefore, the framers at the Wyandotte Convention drafted into the proposed Bill of Rights Section 7, the Religious Liberty Clause, which is much more detailed than the First Amendment to the United States Constitution.[38] The drafters also included what is now Section 6, Subsection (c) of the Education Article in the Kansas Constitution. At the time of its drafting, this clause was Section 8, but only the placement has changed.[39] The language remains the same.
Section 7 of the Bill of Rights and Section 6 of Article 6 of the Kansas Constitution have been reviewed in only a handful of cases. The test utilized by the Kansas Supreme Court in determining whether the provisions have been violated depends in part on whose rights are impinged. In determining the right of an individual to freely exercise his religious rights, the Court has not differentiated between the tests used in determining whether a violation of the First Amendment to the United States Constitution or Section 7 of the Bill of Rights of the Kansas Constitution has occurred.[40] However, a much more restrictive stance has been taken by the Court when reviewing whether someone is being compelled to attend or support any form of religion.
The first case to review the authority of a governmental agency to support a sectarian school through tax revenue was A.T.S.F. Rld. Co.v. City of Atchison.[41] The City had levied a tax, the purpose of which was to pay a subscription made by the City for the benefit of two private sectarian colleges. Without citing the law under which the tax was reviewed, the Court stated:
"No argument is required to show the invalidity of the tax. Of course the public is interested in education, and taxes may be authorized and properly levied for the maintenance of public institutions of learning; but in this case the subscription and levy were for private and sectarian institutions. We are concluded [sic] by the statements in the petition as to the character of the colleges proposed to be aided by the city. The demurrer admits that they are not public schools or colleges, such as can be maintained by money drawn from the public treasury. While it is argued that the public is benefited [sic] by the increase of schools and the spread of learning and knowledge, it is not contended that the colleges in question are under the supervision and control of the public, or that there is or could be any legislative authority to expend the public revenues for their support. The officers of the city had no power to impose a tax on the property of the citizens of Atchison to aid private sectarian schools, or to promote private interests and enterprises."[42]
It is possible the Court focused on the private nature of the colleges rather than their sectarian nature in invalidating the tax.[43]
Twelve years later, the Kansas Supreme Court reviewed the actions of a teacher in a public school. As part of the opening exercises of each school day, the teacher recited the Lord's Prayer and the Twenty-Third Psalm. The pupils were not required to take part in the exercises, but were required to refrain from their regular studies and preserve order during such time.[44] In citing both Section 7 of the Bill of Rights and Section 8 of Article 6,[45] the Court acknowledged:
 "Both our constitution and statutes prohibit all form of religious worship or the teaching of sectarian or religious doctrine in the public schools. Section 7 of the bill of rights contains the following provision: `Nor shall any person be compelled to attend or support any form of worship.' That is, no person shall be compelled to pay tithes or taxes to secure or maintain a place where any form of religious worship shall be conducted, or where any religious doctrine is taught; nor shall any form of religious worship be conducted, or any sectarian or religious doctrine be taught, in any place supported by imposition of taxes."[46]
The Court determined that the opening exercise was not a form of religious worship or the teaching of sectarian or religious doctrine, nor was it an attempt by the teacher to inculcate religious dogma.[47]
In Wright v. School District,[48] the Court concluded that a taxpayer could seek an injunction enjoining a school board from using public funds to support a school which was allegedly controlled and operated as a school for the teaching of sectarian religious doctrines. The Court stated that Section 7 of the Bill of Rights and Section 8 of Article 6[49] of the Kansas Constitution and case law set forth in A.T.S.F.Rld. Co. and Billard clearly provided "that no religious sect, or sects, can lawfully control our school funds, nor can sectarian doctrines be taught lawfully in our public schools."[50]
The most recent case in which the rights under Section 7 of the Bill of Rights were reviewed is State v. Evans.[51] In that case, the defendant appealed conditions of his probation which required he attend services at a specified church and that he perform 1,000 hours of maintenance work at the church.[52] The Court noted that an order of probation which mandated or forced association with a particular religious group was permissible when the condition was clearly related to rehabilitation.[53]
Because "[t]he Kansas Constitution contains a strong prohibition against religious coercion, . . . only those interests of the highest order" could be allowed to override the free exercise of religion.[54] The Court found that the State failed to show such interests.
Section 7 of the Bill of Rights of the Kansas Constitution clearly provides that no person may be compelled to pay tithes or taxes to secure or maintain a place where any form of religious worship is conducted, or where any religious doctrine is taught, and Section 6 of Article 6 precludes any religious sect from controlling any part of the public educational funds. The educational opportunities certificate issued under the programs proposed in SB 295, HB 2504, and HB 2462 is not earned by the parent for services provided to the State, nor may it be used at the complete discretion of the parent. The certificate may be used only for the purpose of acquiring educational services for a child. If the child withdraws from the school that received the proceeds supporting the certificate, the school is required to reimburse excess funds to the State for deposit in the State's general fund. The private choice of the parent in selecting the school the child will attend does not alter the character of the funds supporting the certificate. The funds remain public educational funds. The funds may not be used to secure or maintain an institution in which religious doctrine is taught, nor may the funds be controlled by a religious sect. Because the voucher programs proposed in SB 295, HB 2504, and HB 2462 have the effect of compelling taxpayers to secure or maintain institutions where religious doctrine is taught and allowing religious sects to control a part of public educational funds, the programs proposed in the Bills violate Section 7 of the Bill of Rights and Section 6 of Article 6 of the Kansas Constitution.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Richard D. Smith Assistant Attorney General
CJS:JLM:RDS:jm
[1] "[W]hile the legislature cannot delegate its constitutional power to make a law, it can make a law which delegates the power to determine some fact or state of things upon which such law shall become operative. In other words, the legislature may enact general provisions but leave to those who are to act certain discretion in `filling in the details,' so to speak, provided, of course, it fixes reasonable and definite standardswhich govern the exercise of such authority." State ex rel. Fatzer v.Urban Renewal Agency of Kansas City. 179 Kan. 435, 440 (1956). (Emphasis added.) It appears the Bills fail to provide reasonable and definite standards to be applied by the private accreditation associations. However, the issue has not been fully researched as it was not raised in the request for an opinion. We merely raise it because sponsors of similar programs in the future should be aware of such concerns.
[2] U.S. Const., Amend. 1.
[3] 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).
[4] 473 U.S. 402, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985).
[5] 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985).
[6] 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1973).
[7] Agostini, 521 U.S. at 222.
[8] Committee for Pub. Educ. and Religious Liberty v. Regan,444 U.S. 646, 662, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); Committee forPub. Educ. and Religious Liberty v. Nyquist, 413 U.S. 756, 760,93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).
[9] Lemon, 403 U.S. at 612-13.
[10] Mueller v. Allen, 463 U.S. 388, 394-95, 103 S.Ct. 3062,77 L.Ed.2d 721 (1983).
[11] Wallace v. Jaffree, 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29
(1985) (emphasis added).
[12] Mueller, 463 U.S. at 395.
[13] The Court also abandoned the presumptions that "the placement of public employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." Agostini,521 U.S. at 223.
[14] Agostini, 521 U.S. at 222.
[15] Agostini, 521 U.S. at 225-26.
[16] Agostini, 521 U.S. at 231.
[17] Witters v. Washington Dept. of Services for the Blind, 474 U.S. 481,486, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986).
[18] Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 8,113 S.Ct. 2462, 125 L.Ed.2d 1 (1993).
[19] Everson v. Bd. of Educ., 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711
(1947).
[20] Lemon, 403 U.S. at 619.
[21] Agostini, 521 U.S. at 233.
[22] Agostini, 521 U.S. at 232.
[23] Hernandez v. Commissioner, 490 U.S. 680, 696-97, 109 S.Ct. 2136,104 L.Ed.2d 766 (1989).
[24] Jackson v. Benson, 578 N.W.2d 602 (Wisc. 1998), cert. denied,
___ U.S. ___, 119 S.Ct. 466, 142 L.Ed.2d 419 (1998).
[25] Agostini, 521 U.S. at 234.
[26] Aguilar, 473 U.S. at 402.
[27] Jackson, 578 N.W.2d at 602; Simmons-Harris v. Goff, 711 N.E.2d 203
(Ohio 1999); Kotterman v. Killian, 972 P.2d 606 (Ariz. 1999) (on tax credits); Campbell v. Manchester Bd. of School Dir., 641 A.2d 352
(Vermont 1994).
[28] Jackson, 578 N.W.2d at 620.
[29] Id.
[30] Attorney General Opinion No. 94-37; 16A Am.Jur.2d ConstitutionalLaw § 477.
[31] State v. Smith, 155 Kan. 588, 594-95 (1942).
[32] Attorney General Opinion No. 94-37.
[33] Kan. Const., Bill of Rights, § 7 (emphasis added).
[34] Attorney General Opinion No. 94-37; Heller, The Kansas State Constitution: A Reference Guide 52 (1993). Compare Ohio Const., Art. 1, § 7; Ind. Const., Bill of Rights, §§ 2-6.
[35] Edgington v. City of Overland Park, 15 Kan. App. 2d 721, 728
(1991).
[36] U.S. Const., Amend. 14.
[37] See Smith, 155 Kan. at 594.
[38] Id.
[39] Placement was changed in the 1966 recodification of the Kansas Constitution.
[40] See State v. Barclay, 238 Kan. 148 (1985); State, ex rel. Pringlev. Heritage Baptist Temple, Inc., 236 Kan. 544 (1985); State v. Garber,197 Kan. 567 (1966); Wright v. Raines, 1 Kan. App. 2d 494 (1977).
[41] 47 Kan. 712 (1892).
[42] Id. at 714.
[43] But see Wright v. School District, 151 Kan. 485, 486 (1904).
[44] Billard v. Board of Education, 69 Kan. 53, 54 (1904).
[45] Article 6 of the Kansas Constitution was recodified in 1966. Section 8 of that Article is now Section 6 of Article 6.
[46] Billard, 69 Kan. at 56.
[47] Id. at 58.
[48] 151 Kan. 485 (1940).
[49] See fn. 44.
[50] Wright, 151 Kan. at 486.
[51] 14 Kan. App. 2d 591 (1990).
[52] Evans, 14 Kan. App. 2d at 591.
[53] Id. at 593.
[54] Id.