(252 P.3d 141)
No. 105,366

MARY D. STINEMETZ, *Appellant*, v. KANSAS HEALTH POLICY
AUTHORITY, *Appellee*.

—

Opinion filed May 4, 2011.

*Corinne Petrik*, of Kansas Legal Services, of Hays, and *Lowell C. Paul*, of Kansas Legal Services, of Topeka, for appellant.

*Brian M. Vazquez*, of Kansas Health Policy Authority, for appellee.

*Keturah A. Dunne*, associate general counsel, of Watchtower Bible and Tract Society of New York, Inc., of Patterson, New York, and *Tony A. Potter*, of Potter Law Office, P.A., of Hill City, for *amicus curiae* Watchtower Bible and Tract Society of New York, Inc.

Before HILL, P.J., MALONE and BUSER, JJ.

MALONE, J.: Mary D. Stinemetz, a Kansas citizen and a practicing Jehovah's Witness, needs a liver transplant, yet her religious beliefs prohibit blood transfusions. There is a medically accepted technique, known as a bloodless liver transplant, in which liver transplant surgery can be performed without a blood transfusion, although many medical facilities do not consider this technique to be the safest procedure. Cost is not the issue. The available evidence indicates that the bloodless technique is less expensive than a procedure involving blood transfusions. There is no medical facility in Kansas that performs bloodless liver transplants, but the Nebraska Medical Center in Omaha is willing to perform the surgery.

Because Stinemetz is a beneficiary of the Kansas Medical Assistance Program (Medicaid), she requested prior authorization from the Kansas Health Policy Authority (KHPA) for an out-of-state

liver transplant. There is no question that the KHPA would authorize a liver transplant for Stinemetz in Kansas, including a bloodless liver transplant if a medical facility was available in Kansas to perform the technique. However, the KHPA denied Stinemetz' request for prior authorization for out-of-state services on the ground that her religious preference did not constitute a medical necessity. The district court affirmed the KHPA's denial of prior authorization. Stinemetz appeals, asserting that the denial violated her rights under the Free Exercise Clause of the First Amendment to the United States Constitution and § 7 of the Kansas Constitution Bill of Rights. For the reasons set forth herein, we agree with Stinemetz' claims under both the federal and Kansas Constitutions, and we reverse and remand with directions that the KHPA grant Stinemetz' request for prior authorization for an out-of-state liver transplant.

## FACTUAL AND PROCEDURAL BACKGROUND

Stinemetz was initially diagnosed with primary biliary cirrhosis in 1989; since then, her liver function has deteriorated. By 2009, it became apparent that Stinemetz needed a liver transplant. At that point, she had been a devout practicing Jehovah's Witness for over 35 years. Due to her religious beliefs, she refuses to accept whole blood transfusions. She also refuses any procedure whereby her own blood is removed from her body and stored for later use in a surgical procedure.

On June 3, 2009, a committee at the University of Kansas Medical Center (KUMC) met to review and discuss Stinemetz' case and the possibility of performing a liver transplant on Stinemetz at KUMC. The committee decided it could not safely perform a bloodless liver transplant at KUMC; therefore, it declined to evaluate her for the procedure. Dr. Ryan Taylor at KUMC recommended that Stinemetz be referred to another center with experience in bloodless transplants, such as the University of Oklahoma.

In November 2009, Stinemetz was hospitalized for 5 days at St. Luke's Hospital in Kansas City, Missouri, for treatment of a left pleural effusion. By this point, Stinemetz had been diagnosed with end-stage liver disease. Her doctors believed that her only recourse

was a liver transplant. Dr. Richard Gilroy at KUMC suggested Nebraska Medical Center in Omaha as a facility that could perform a bloodless liver transplant.

Stinemetz is a recipient of Medicaid, and the KHPA is the state agency responsible for supervising and administering Medicaid assistance in Kansas. K.S.A. 2010 Supp. 75-7409. Under K.A.R. 30-5-70(c)(2), any out-of-state services that occur farther than 50 miles from the Kansas border will only be reimbursed by Medicaid if the service is an emergency service, prior authorization has been issued, or the service is provided by an independent laboratory. Because Nebraska Medical Center is more than 50 miles from the Kansas border, Stinemetz requested prior authorization from the KHPA for the out-of-state facility to perform the transplant.

On January 11, 2010, the KHPA notified Stinemetz that it was denying her request for prior authorization for the out-of-state liver transplant. Specifically, the KHPA informed Stinemetz that her request for prior authorization was "reviewed and denied for out of state services, relegious [sic] preference does not meet medical necessity, through the Kansas Health Policy Authority Medical Work Group." On January 28, 2010, Dr. Gary A. Thompson wrote a letter for Stinemetz asking for an expedited appeal of the denial, stating that Stinemetz' "risk of death is high, due to liver failure."

On February 2, 2010, Stinemetz filed her request for an administrative hearing. Christy Escobar, the fair hearings analyst for HP Enterprise Services, Kansas' fiscal agent for Medicaid, prepared an agency summary of the case and filed the summary on February 10, 2010. The agency summary stated:

"The beneficiary has requested to have a bloodless liver transplant because of her religious beliefs. The prior authorization request was denied because there is no medical necessity for the beneficiary to have a bloodless transplant—a regular liver transplant is available in Kansas and would be considered medically necessary. The beneficiary's religious preference to have a bloodless liver transplant does not meet medical necessity, through the Kansas Health Policy Authority Medical Work Group."

An administrative hearing was held on March 1, 2010. At the hearing, Escobar testified about her agency summary. Dr. Wayne Oren Wallace, Jr., clinical consultant for the KHPA, also testified

at the hearing. Wallace testified that the medical work group reviewed Stinemetz' request for prior authorization and ultimately decided that the KHPA would pay for the liver transplant at KUMC, but the KHPA would not authorize a bloodless procedure because it required Stinemetz to go to a different facility out-of-state. Wallace acknowledged that if KUMC would perform a bloodless liver transplant, Medicaid would pay for the procedure. Wallace also acknowledged that there are certain negative effects associated with blood transfusions.

Scott Bears, a program manager with the KHPA, also testified at the hearing. Bears oversees coverage issues involving transplants. Bears testified that he worked with the medical work group in discussing and resolving Stinemetz' request for prior authorization. According to Bears, when determining coverage, the first step is to determine whether the requested service is a covered service. Bears testified that Stinemetz' liver transplant at the Nebraska Medical Center was not a covered service because a hospital in Kansas could perform the procedure, but without using the bloodless technique.

Finally, Stinemetz testified at the hearing. At the time of the hearing, she was 63 years old, and she testified she had liver problems for many years. Stinemetz testified that she had been a practicing Jehovah's Witness since she was 28 years old. Stinemetz further testified that she would refuse a blood transfusion even in a life-threatening situation because she is a Jehovah's Witness, and she read passages from the Bible on which she based her belief that blood transfusions are prohibited. She also testified that her religious beliefs would not allow her own blood to be removed from her body and stored for later use in a surgical procedure.

Stinemetz further testified that she would be happy to schedule her surgery in Kansas if there was an available facility within the state that provided bloodless liver transplants. Because there is no such medical facility in Kansas, Stinemetz testified she was requesting Medicaid to honor her religious principles and pay for the procedure out-of-state. Stinemetz acknowledged that if she received a blood transfusion against her religious beliefs, she would

still be allowed to be a member of her congregation if she was truly repentant for what she had done.

As part of the agency record, Stinemetz presented written material including several articles from scientific journals about bloodless surgery techniques. The articles described how bloodless surgical procedures have become widespread and some medical providers consider the technique to be safer than using blood transfusions. According to one article submitted by Stinemetz, Englewood Hospital's New Jersey Institute for the Advancement of Bloodless Medicine and Surgery has successfully performed more than 1,500 bloodless procedures since 1994, and many patients other than Jehovah's Witnesses preferred the bloodless technique to avoid the risks associated with blood transfusions. The articles also described that the bloodless technique is less expensive than a procedure involving blood transfusions. Stinemetz' written material was admitted into evidence without objection at the administrative hearing. In closing argument, Stinemetz' counsel stated, "We do believe that denying Mary Stinemetz coverage for a bloodless liver transplant evaluation, and by extension the surgery itself, constitutes a burden on her free exercise of religion without a compelling state interest to justify that burden."

On March 25, 2010, the presiding officer issued an initial order which affirmed the agency's decision. The presiding officer found that Stinemetz' desire for a bloodless transplant "is a personal request, which exceeds medical necessity pursuant to the respondent's regulations. A liver transplant, which is medically necessary for the appellant, can be provided within the state and out-of-state authorization was properly denied." The presiding officer did not address Stinemetz' constitutional claim.

Stinemetz filed her appeal with the KHPA State Appeals Committee (Appeals Committee) on April 2, 2010, claiming that the denial of the prior authorization violated "the provisions of the Free Exercise Clause of the First Amendment to the Constitution of the United States and Section 7 of the Bill of Rights of the Kansas Constitution." Both parties submitted written briefs to the Appeals Committee addressing the constitutional claims. On June 15, 2010, the Appeals Committee issued its final order and adopted

the presiding officer's findings of fact and conclusions of law. Specifically, the Appeals Committee found that "[t]he basis of the denial is that out-of-state services are not required because religious preference does not meet medical necessity criteria. A liver transplant can be provided to the appellant in the State of Kansas."

On June 28, 2010, Stinemetz filed her petition for judicial review in Graham County. The petition for judicial review specifically alleged that the KHPA's decision, which conditioned the provision of a life-saving public benefit on Stinemetz agreeing to engage in conduct which violated her deeply held religious beliefs, violated her rights under the First Amendment to the United States Constitution and § 7 of the Kansas Constitution Bill of Rights. The agency record was submitted to the district court for de novo review, and neither party requested to submit additional evidence. Both parties submitted written briefs to the district court, but the district court did not hear oral argument in the case.

The district court filed its memorandum decision and order on December 1, 2010. The district court specifically found that "[t]here is nothing to indicate that [Stinemetz'] request for a bloodless liver transplant is based on anything other than her sincere and deeply held religious belief." Nevertheless, the district court affirmed the KHPA's decision, finding it was supported by substantial evidence. The district court dedicated less than one paragraph to the constitutional issues, stating:

"It has not been shown that KHPA's refusal to grant the University of Nebraska's request for prior authorization to perform a bloodless liver transplant on Ms. Stinemetz is unconstitutional. State courts may not interfere in matters concerning religious doctrine or organization. Matters of redemption are best left to others. It is not appropriate for secular authorities, including courts, to investigate or decide matters that are almost entirely ecclesiastical in nature."

Stinemetz timely filed her notice of appeal on December 9, 2010, and the appeal was docketed on December 15, 2010. This court ordered the appeal to be expedited. The record was received from district court on March 14, 2011, and oral argument was held on April 20, 2011.

Stinemetz raises two issues on appeal. First, Stinemetz claims that the KHPA's denial of her request for prior authorization for

an out-of-state transplant violated her rights under the Free Exercise Clause of the First Amendment to the United States Constitution. Second, Stinemetz claims that the KHPA's denial of her request for prior authorization for an out-of-state transplant violated her rights under § 7 of the Kansas Constitution Bill of Rights. The KHPA raises a preliminary issue claiming that Stinemetz failed to properly preserve the constitutional issues for judicial review.

## WERE THE CONSTITUTIONAL ISSUES PROPERLY PRESERVED?

The KHPA argues that Stinemetz failed to properly preserve for judicial review the issues regarding the constitutionality of the KHPA's actions. Essentially, the KHPA contends that Stinemetz failed to raise the legal issue of constitutionality before the administrative agency, thereby failing to preserve it for review by the district court or this court on appeal. The KHPA further argues that Stinemetz failed to substantiate her constitutional claims with sufficient evidence at the administrative hearing, and that this failure precluded the district court from properly considering the constitutional claims.

Stinemetz responds by pointing out that the district court rejected the KHPA's argument that the constitutional issues were not properly preserved for judicial review, and the KHPA did not appeal from that ruling. Additionally, Stinemetz contends that she clearly met her burden of proof and presented evidence on her constitutional claims before the administrative agency.

Although the KHPA, Stinemetz, and the district court all referred to this issue as jurisdictional, the Kansas Supreme Court has noted a distinction between a lack of jurisdiction and a failure to preserve issues for judicial review. See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 408-13, 204 P.3d 562 (2009) (discussing a failure to exhaust administrative remedies as distinct from a failure to properly preserve issues for judicial review). We agree with the KHPA that in an appeal from a decision by an administrative agency, generally a party is limited to the issues raised at the administrative hearing. K.S.A. 2010 Supp. 77-618; *Kingsley* 288 Kan. at 411.

In district court, the KHPA argued that Stinemetz had failed to properly preserve the constitutional issues for judicial review, but the district court rejected the KHPA's argument. In its memorandum decision, the district court specifically found that "the [constitutional] issue was raised by the parties and counsel at the administrative level." As Stinemetz points out, the KHPA did not appeal this finding or file a cross-appeal in this action. Our Supreme Court has held "that before an appellee may present adverse rulings to the appellate court it must file a cross-appeal. If the appellee does not, we have held that the issue is not properly preserved before the court and may not be considered. [Citations omitted.]" *Cooke v. Gillespie*, 285 Kan. 748, 755, 176 P.3d 144 (2008). Because the KHPA did not appeal the district court's finding that Stinemetz properly raised the constitutional issue at the administrative level and thereby preserved the issue for judicial review, the KHPA may not now argue the issue before this court.

Also, even if the KHPA is correct in arguing that Stinemetz failed to properly raise the constitutional issue at the administrative level, such a failure does not preclude her from raising the issue for the first time in district court. Our Supreme Court has held that "because administrative agencies cannot rule on constitutional questions, the issue of constitutionality can be raised for the first time before a court of law. [Citation omitted.]" *Solis v. Brookover Ranch Feedyard, Inc.*, 268 Kan. 750, 757, 999 P.2d 921 (2000).

The KHPA also argues that Stinemetz failed to substantiate her constitutional claims with sufficient evidence at the administrative hearing. However, this argument is not supported by the record. When Stinemetz filed her request for an administrative hearing, Escobar prepared an agency summary of the case and filed the summary on February 10, 2010, before the administrative hearing was held. The agency summary outlined all the steps that had taken place concerning Stinemetz' request for prior authorization. The agency summary further stated: "The beneficiary has requested to have a bloodless liver transplant because of her religious beliefs. . . . The beneficiary's religious preference to have a bloodless liver transplant does not meet medical necessity, through the Kansas Health Policy Authority Medical Work Group." The agency sum-

mary was admitted into evidence by the KHPA at the administrative hearing. Thus, through the agency summary, the KHPA was aware even before the administrative hearing was commenced that Stinemetz' religious preference was the key issue between the parties.

At the administrative hearing, Stinemetz testified that she would refuse a blood transfusion even in a life-threatening situation because she is a Jehovah's Witness, and she read passages from the Bible on which she based her belief that blood transfusions are prohibited. Stinemetz further testified that because there was no available medical facility in Kansas that provided bloodless transplants, she was requesting Medicaid to honor her religious principles and pay for the procedure out of state. As part of the agency record, Stinemetz presented written material including several articles from scientific journals about bloodless surgery techniques. Stinemetz' written material was admitted into evidence without objection at the administrative hearing. In closing argument, Stinemetz' counsel stated, "We do believe that denying Mary Stinemetz coverage for a bloodless liver transplant evaluation, and by extension the surgery itself, constitutes a burden on her free exercise of religion without a compelling state interest to justify that burden."

After the presiding officer affirmed the KHPA's denial of her request for prior authorization, Stinemetz filed her appeal with the Appeals Committee, claiming that the denial of the prior authorization violated "the provisions of the Free Exercise Clause of the First Amendment to the Constitution of the United States and Section 7 of the Bill of Rights of the Kansas Constitution." Both parties submitted written briefs to the Appeals Committee addressing the constitutional claims. The Appeals Committee affirmed the presiding officer's initial order and specifically found that "[t]he basis of the denial is that out of state services are not required because religious preference does not meet medical necessity criteria."

Stinemetz substantiated her constitutional claims with sufficient evidence at the administrative hearing. The KHPA provided no evidence at the administrative hearing to support a compelling

state interest to justify its denial of Stinemetz' request for prior authorization. However, the KHPA had the opportunity to present such evidence at the administrative hearing because the KHPA knew from the agency summary filed prior to the hearing that Stinemetz' religious preference was the key issue between the parties. We conclude that Stinemetz raised the constitutional issues at the administrative level and, more necessarily, she substantiated her constitutional claims with sufficient evidence at the administrative hearing which was submitted to the district court for de novo review. The fact that the KHPA chose to not present any evidence on the constitutional issues either at the administrative level or before the district court is to no avail. Accordingly, we will now proceed to address the constitutional claims Stinemetz has raised on appeal.

## STINEMETZ' FIRST AMENDMENT CLAIM

Stinemetz first claims that the KHPA's denial of her request for prior authorization for an out-of-state transplant violated her rights under the Free Exercise Clause of the First Amendment to the United States Constitution. Stinemetz argues in her brief that "conditioning receipt of an important public benefit upon conduct prohibited by religious faith is presumptively unconstitutional and must be justified by a compelling state interest." Stinemetz asks this court to find that the KHPA's actions have substantially infringed upon her right to the free exercise of her religion and that those actions are not the least restrictive means of serving a compelling state interest.

The scope of judicial review of a state administrative agency action is defined by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq.* An appellate court exercises the same limited review as does the district court; it is as though the appeal had been made directly to the appellate court. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010). As the party asserting the agency's action was invalid, Stinemetz bears the burden of proving its invalidity. K.S.A. 2010 Supp. 77-621(a)(1). K.S.A. 2010 Supp. 77-621(c) provides eight instances in which a court shall grant relief from an agency action. Stinemetz relies on subsection (1): "The

agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied."

Here, the administrative agency did not rule on the constitutionality of its action. Administrative agencies cannot decide constitutional questions; only the courts can decide constitutional questions. *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 632, 176 P.3d 938 (2008). The district court also declined to rule on the constitutionality of the agency's action. However, whether a statute or regulation is constitutional as applied is a question of law over which an appellate court has unlimited review. *State v. Laturner*, 289 Kan. 727, 735, 218 P.3d 23 (2009).

The First Amendment to the United States Constitution mandates that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Stinemetz asserts that the KHPA's denial of her request for prior authorization violated her rights under the Free Exercise Clause of the First Amendment. There are two primary lines of cases that are relevant to Stinemetz' First Amendment claim: *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963), and its progeny, and *Employment Div., Ore. Dept. of Human Res. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), *superseded in part by* 42 U.S.C.A. § 2000bb (1993), and its progeny.

In *Sherbert*, a member of the Seventh-day Adventist Church was discharged by her employer because she would not work on Saturday, which was the Sabbath Day of her faith. After her termination, the employee applied for state-sponsored unemployment compensation. Under the South Carolina statute, an employee was ineligible for unemployment benefits if he or she had failed without good cause to accept suitable work offered by the employer. The South Carolina Employment Security Commission (Commission) found that the employee's refusal to work on Saturday constituted failure without good cause to accept suitable work when offered; therefore, it denied her unemployment benefits. The South Carolina Supreme Court eventually rejected the employee's conten-

tion that the disqualifying provisions of the statute, as applied, violated her right to the free exercise of her religion under the First Amendment and made applicable to the states through the Fourteenth Amendment to the United States Constitution.

On appeal, the United States Supreme Court first considered whether the disqualification of unemployment benefits imposed a burden on the free exercise of the employee's religion and found that it did. The Court stated:

"Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion, in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." 374 U.S. at 404.

Finding that there was a burden on the employee's free exercise of religion, the Supreme Court next considered whether the burden was justified by a compelling state interest. 374 U.S. at 406. The Commission suggested a possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might not only dilute the unemployment compensation fund but also hinder the scheduling by employers of necessary Saturday work. However, the Supreme Court noted that the Commission did not raise this objection in state court and, in any event, the contention was not supported by the record. 374 U.S. at 407. The Supreme Court also concluded that even if the possibility of spurious claims did threaten to dilute the fund and disrupt the scheduling of work, the Commission would also need to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights. 374 U.S. at 407. Because the Commission failed to meet these tests, the Supreme Court held that the State could not constitutionally apply the unemployment eligibility provisions so as to constrain the employee to abandon her religious convictions respecting the day of rest. 374 U.S. at 410.

Stinemetz also cites *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18, 101 S. Ct. 1425, 67 L. Ed 2d 724 (1981), another unemployment benefits case, for the proposition that when the state's action conditions the receipt of an important public benefit upon action proscribed by a person's religious beliefs, nothing less than a compelling interest "of the highest order" will suffice. Applying the *Sherbert* test, Stinemetz asks this court to find that a state policy infringing on the free exercise of religion can only be upheld if there is a compelling state interest of the highest order, and then only if the State's position is the least restrictive means of achieving that interest.

Stinemetz argues that Kansas appellate courts have "repeatedly" acknowledged and applied the *Sherbert* test in analyzing claims under the Free Exercise Clause of the First Amendment. In *Powers v. State Department of Social Welfare,* 208 Kan. 605, 493 P.2d 590 (1972), the plaintiff refused to undergo a medical examination to qualify for welfare benefits under the state Aid to Disabled Program, claiming that her religious beliefs did not permit such an examination. The Kansas Supreme Court cited *Sherbert* and stated that the State may provide public services upon a condition which is contrary to the religious scruples of some of its citizens, but only if the condition is justified by a compelling state interest. 208 Kan. at 614. In *Wright v. Raines*, 1 Kan. App. 2d 494, 571 P.2d 26 (1977), two Kansas prisoners challenged a regulation prohibiting the wearing of beards by an inmate on the ground that the regulation violated the free exercise of their Sikh religion. In weighing the state's interests in enforcing the regulation, the Kansas Court of Appeals noted that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." 1 Kan. App. 2d at 501.

In its *amicus* brief, Watchtower Bible and Tract Society of New York, Inc. (Watchtower) cited *State ex rel. Pringle v. Heritage Baptist Temple, Inc.*, 236 Kan. 544, 693 P.2d 1163 (1985). In *Pringle*, the State attempted to enjoin Heritage Baptist Temple, Inc. (Temple) from operating a day-care center without a license. The Temple asserted a defense under the Free Exercise Clause of the First Amendment. In analyzing the claim, the Kansas Supreme Court

held that where governmental regulations come into conflict with the freedom to practice religion, the justification for the regulation is dependent on three factors: (1) does a genuine religious liberty claim exist and, if so, does the State burden violate that liberty; (2) if the State violates the liberty right, is it justified by a compelling state interest; and (3) does the State use the least restrictive means of regulation. Although the Supreme Court ultimately ruled against the Temple, Watchtower asserts that this case stands for the proposition that Kansas follows the *Sherbert* compelling state interest test in analyzing claims under the Free Exercise Clause of the First Amendment.

The KHPA argues that the *Sherbert* test no longer applies to First Amendment claims, and instead points to *Employment v. Smith*. In that case, two employees were fired from their jobs because they ingested peyote for sacramental purposes during a ceremony of the Native American Church, of which they were both members. Under Oregon law, knowingly or intentionally possessing a Schedule I controlled substance, including peyote, was a class B felony, unless the substance has been prescribed by a medical practitioner. The employees were later determined ineligible for unemployment benefits because they had been fired due to work-related misconduct. After a protracted procedural history that included a remand from the United States Supreme Court, the Oregon Supreme Court held that the employee's peyote use was prohibited by the Oregon criminal statute but that the statute was invalid under the Free Exercise Clause of the First Amendment. Thus, the Oregon Supreme Court reaffirmed its previous ruling that the State could not deny unemployment benefits to the employees for having engaged in the sacramental use of peyote.

On appeal, the United States Supreme Court distinguished the *Sherbert* line of cases by pointing out that "the conduct at issue in those cases was not prohibited by law." 494 U.S. at 876. Further, the Supreme Court stated that the *Sherbert* test had never been used to invalidate any governmental action except the denial of unemployment compensation, and that "[i]n recent years we have abstained from applying the *Sherbert* test (outside the unemployment compensation field) at all." 494 U.S. at 883. Instead, the

Supreme Court found the correct interpretation of the Free Exercise Clause to be: "[I]f prohibiting the exercise of religion . . . is not the object of the [regulation] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended. [Citations omitted.]" 494 U.S. at 878. Under this test, the Supreme Court found the Oregon criminal statute to be constitutional. Because the employees' ingestion of peyote was prohibited under Oregon law, and because that prohibition was constitutional, the Supreme Court held that Oregon may, consistent with the Free Exercise Clause, deny the employees unemployment compensation when their dismissal resulted from the use of the drug. 494 U.S. at 890.

In response to *Employment v. Smith*, Congress passed the Religious Freedom Restoration Act (RFRA), which restored the compelling interest test from *Sherbert*. 42 U.S.C.A. § 2000bb(b)(1); *City of Boerne v. Flores*, 521 U.S. 507, 515, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997). The United States Supreme Court struck down part of the RFRA in *City of Boerne*, finding that Congress exceeded its enforcement power under the Fourteenth Amendment and that the RFRA was therefore inapplicable to state law. 521 U.S. at 529-36. Although arguably the RFRA still applies to federal laws that burden the free exercise of religion, Stinemetz' case involves a state regulation; therefore, the rule enunciated by the Court in *Employment v. Smith* applies.

*Employment v. Smith* essentially removed the strict scrutiny or compelling interest test from the Free Exercise Clause analysis. However, the Court also indicated that the "only decisions in which [the Court has] held that the First Amendment bars application of a neutral, generally applicable law to a religiously motivated action involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections." 494 U.S. at 881. This has become known as the "hybrid exception." The Court further stated that "our decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason.

[Citation omitted.]" 494 U.S. at 884. This has become known as the "individual exemption exception."

The hybrid exception and the individual exemption exception are regarded today as the only two situations in which strict scrutiny is still the appropriate test for a state law challenged under the federal Constitution's Free Exercise Clause. Graff, *Free Exercise and Hybrid Rights; An Alternative Perspective on the Constitutionality of Same-Sex Marriage Bans*, 29 U. Haw. L. Rev. 23, 29 (2006). In other scenarios, a generally applicable and neutral regulation that incidentally burdens religious exercise does not violate the First Amendment. See *Church of the Lukumi Babalu Aye, Inc. v Hialeah*, 508 U.S. 520, 531, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993) (law that is neutral and of general applicability need not be justified by compelling governmental interest even if law has the incidental effect of burdening a particular religious practice).

The KHPA contends that this court should follow *Employment v. Smith* and find that the Kansas regulation prohibiting Medicaid assistance for out-of-state services is a generally applicable, valid, and neutral law that only incidentally burdens the free exercise of religion. As a result, the regulation does not violate the Free Exercise Clause of the First Amendment. The KHPA points to *Lower v. Board of Dir. of Haskell County Cemetery Dist.*, 274 Kan. 735, 56 P.3d 235 (2002), for the proposition that Kansas has adopted the *Employment v. Smith* test in analyzing claims under the First Amendment. In *Lower*, the Haskell County Cemetery District board of directors requested the plaintiffs to remove a monument to unborn children from the plaintiff's cemetery. The plaintiffs filed a lawsuit against the board of directors under 42 U.S.C. § 1983. In analyzing the plaintiffs' claims under the Free Exercise Clause of the First Amendment, the Kansas Supreme Court cited with approval the test enunciated by the United States Supreme Court in *Employment v. Smith*. 274 Kan. at 748.

Under *Employment v. Smith*, if the Kansas Medicaid regulations at issue are neutral and generally applicable, the regulations do not violate the First Amendment even if the regulations have the incidental effect of burdening Stinemetz' free exercise of her religious beliefs. Stinemetz does not assert that the Kansas regulations

in question are facially discriminatory, nor does she argue that the Medicaid regulations were enacted or are enforced in such a way as to target Jehovah's Witnesses. The Kansas Medicaid regulations appear to be neutral and generally applicable. If this case presented only a straightforward *Employment v. Smith* analysis, the KHPA would prevail against Stinemetz' First Amendment claim.

*Individual exemption exception*

However, Stinemetz additionally argues that the individual exemption exception articulated in *Employment v. Smith* applies here and triggers strict scrutiny. As stated above, the Court in *Employment v. Smith* recognized that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason. [Citation omitted.]" 494 U.S. at 884. Stinemetz argues that Kansas regulations create a system of individual exemptions and therefore the KHPA could not refuse to allow her an individual exemption without a compelling reason. Specifically, Stinemetz points to K.A.R. 30-5-58(ooo)(1)(E), which defines part of the criteria for determining whether a health intervention is a "medical necessity." To fully understand Stinemetz' argument, a review of the applicable administrative regulations and history of Medicaid in Kansas is necessary.

At one time, the Kansas Department of Social and Rehabilitation Services (SRS) was the state agency responsible for Medicaid in Kansas. See K.S.A. 39-708c(s). On July 1, 2005, all of the powers, duties, and functions of SRS and the Secretary of SRS related to Medicaid were transferred to the Division of Health Policy and Finance within the Department of Administration and to the Director of Health Policy and Finance. K.S.A. 2006 Supp. 75-7413(a). In turn, on July 1, 2006, the KHPA became solely responsible for supervising and administering the Kansas plan for Medicaid. K.S.A. 2010 Supp. 75-7409.

Essentially, the transfers of authority meant that all of the power and authority SRS had over the Medicaid program is now held by the KHPA. Further, under K.S.A. 2010 Supp. 75-7414(b):

"On and after July 1, 2006, whenever the division of health police and finance within the department of administration or the director of health policy and finance, or words of like effect, are referred to or designated by a statute, contract, memorandum of understanding, plan, grant, waiver or other document and such reference is in regard to any of the powers, duties or functions transferred to [KHPA] pursuant to K.S.A. 2010 Supp. 75-7413, and amendments thereto, such reference or designation shall be deemed to apply to [KHPA]."

There are numerous Kansas Administrative Regulations that govern the complex structure of Kansas' Medicaid program. See K.A.R. 30-5-58 through 30-5-310, 129-5-1 through 129-6-152. K.A.R. 129-5-1(a) allows the KHPA to require prior authorization or precertification for a medical service "for any of the following reasons: (1) To ensure that provision of the service is medically necessary; (2) to ensure that services that could be subject to overuse are monitored for appropriateness in each case; and (3) to ensure that services are delivered in a cost-effective manner." Further, under K.A.R. 30-5-63, which is entitled "Medical necessity," "[e]xcept as specifically set forth in program policy, the agency shall not reimburse a provider for the provision of a covered service to a program recipient unless the provision of the service was medically necessary." Both Stinemetz and the KHPA agree that "medically necessary" as used in K.A.R. 30-5-63 is defined by K.A.R. 30-5-58(ooo).

The KHPA maintains that Stinemetz' request for prior authorization for the out-of-state liver transplant was denied because it was not medically necessary and therefore was not a covered service under the applicable regulations. Stinemetz argues, on the other hand, that even if this assertion is correct, K.A.R. 30-5-58(ooo)(1)(E) provides the Director of the KHPA with the discretion to cover a service that otherwise would not be covered, even when the service does not meet the definition of medical necessity. In order to determine whether this provision creates a "system of individual exemptions" sufficient to require a compelling state interest under *Employment v. Smith*, we must examine K.A.R. 30-5-58(ooo)(1) in its entirety.

K.A.R. 30-5-58(ooo) states:

"(1) 'Medical necessity' means that a health intervention is an otherwise covered category of service, is not specifically excluded from coverage, and is medically necessary, according to all of the following criteria:

(A) 'Authority.' The health intervention is recommended by the treating physician and is determined to be necessary by the secretary or the secretary's designee.

(B) 'Purpose.' The health intervention has the purpose of treating a medical condition.

(C) 'Scope.' The health intervention provides the most appropriate supply or level of service, considering potential benefits and harms to the patient.

(D) 'Evidence.' The health intervention is known to be effective in improving health outcomes. For new interventions, effectiveness shall be determined by scientific evidence as provided in paragraph (ooo)(3). For existing interventions, effectiveness shall be determined as provided in paragraph (ooo)(4).

(E) 'Value.' The health intervention is cost-effective for this condition compared to alternative interventions, including no intervention. 'Cost-effective' shall not necessarily be construed to mean lowest price. *An intervention may be medically indicated and yet not be a covered benefit or meet this regulation's definition of medical necessity. Interventions that do not meet this regulation's definition of medical necessity may be covered at the choice of the secretary or the secretary's designee.* An intervention shall be considered cost effective if the benefits and harms relative to cost represent an economically efficient use of resources for patients with this condition. In the application of this criterion to an individual case, the characteristics of the individual patient shall be determinative." (Emphasis added.)

Stinemetz argues that the italicized language in K.A.R. 30-5-58(ooo)(1)(E) establishes that there is an individual exemption at the choice of the Secretary or the Secretary's designee, thus bringing the regulation under the exception recognized in *Employment v. Smith.* Because of this individual exemption, Stinemetz argues that the KHPA is required to provide a compelling interest to support its denial of the request for prior authorization.

The district court determined that the KHPA did not have the authority under the regulation to grant Stinemetz an exemption to the definition of medical necessity because the regulation confers this authority on the "secretary," and the KHPA has a director, not a secretary. However, it is clear that all the powers, duties, and functions of the Secretary of SRS related to Medicaid were transferred to the Director of the KHPA on July 1, 2006. K.S.A. 2006 Supp. 75-7413(a).

The KHPA's response to Stinemetz' argument concerning the individual exemption exception is somewhat unclear. Essentially, the KHPA states that there are three steps to determining "medical

necessity": KHPA must determine (1) whether the medical procedure is a covered service; (2) if it is a covered service, is it specifically excluded from coverage; and (3) if the procedure is medically necessary. The KHPA argues that its analysis of medical necessity did not progress beyond the first step because the medical procedure was not a covered service.

The KHPA argues that the bloodless aspect of the transplant was not the reason for the denial of the request for prior authorization, stating that the reason for the denial was simply because the facility was more than 50 miles outside the Kansas border. The KHPA cites K.A.R. 30-5-70(c)(2)(A) as standing for the proposition that if a facility is outside the 50-mile limit, the requested medical service is not compensable. As Stinemetz argues, however, this is not what the regulation states, if it is read in its entirety. Contrary to the KHPA's contention, the regulation does not appear to place a blanket prohibition on services outside the 50-mile limit. K.A.R. 30-5-70(c)(2) discusses limitations on payment for out-of-state services and states such payments are limited to the following:

"(A) Payment on behalf of recipients if medical services are normally provided by medical vendors that are located in the bordering state and within 50 miles of the state border, except for community mental health center services, alcohol and drug abuse services, or partial hospitalization services;

"(B) emergency services rendered outside the state;

"(C) *nonemergency services for which prior approval by the agency has been given.* Authorization from the agency shall be obtained before making arrangements for the individual to obtain the out-of-state services;

"(D) services provided by independent laboratories; and

"(E) medical services provided to foster care recipients and medical services in excess of the limitations of the state of residence, when approved by the Kansas department of social and rehabilitation services and within the scope of the adoption agreement for those for whom Kansas was initiated adoption support agreements." (Emphasis added.)

The KHPA concedes that *Employment v. Smith* provides for an exception under a system of individual exemptions. However, the KHPA argues that the strict scrutiny that may be triggered by such a system is designed to expose hidden religious animus. To support this argument, the KHPA directs this court to *Grace United Methodist v. City of Cheyenne,* 451 F.3d 643 (10th Cir. 2006). *Grace*

*United Methodist* concerned a church that applied for a variance from zoning restrictions so that it could operate a 100-child day care in a zone that prohibited operating a day care for more than 12 children. When the city denied the variance, the church filed suit, arguing, among other things, that the zoning ordinances were not neutral laws of general applicability, and there was a system of exceptions in place that triggered strict scrutiny.

The Tenth Circuit Court of Appeals disagreed, describing the church's argument as "asking us to adopt a per se rule requiring that any land use regulation which permits any secular exception satisfy a strict scrutiny test to survive a free exercise challenge." 451 F.3d at 651. In declining to do so, the Tenth Circuit focused on the fact that the record did not show any evidence that the zoning regulations were enacted for the purpose of restricting free exercise of religion. 451 F.3d at 653. Further, the church did not controvert the city's assertion that the city had no authority to grant a variance for anyone or any group, secular or religious, to operate a day care in the desired zone. 451 F.3d at 653-54. Thus, the Tenth Circuit characterized the denial of the variance as "mandatory" and "very different from the government employee's discretionary denial of [plaintiff's] unemployment benefits in *Sherbert* [citation omitted]." 451 F.3d at 654.

The KHPA focuses on the Tenth Circuit's examination of religious animus behind the ordinances, stating that here there is no evidence that shows religious animus behind the regulations governing Medicaid or a deliberate intent to oppress Stinemetz' free exercise of her religion. The KHPA is correct in stating that Stinemetz has not produced evidence that the Medicaid regulations were enacted with the intent to target specific religious groups or suppress the free exercise of religion.

As Stinemetz argues, however, religious animus is not a prerequisite for applying the heightened scrutiny triggered by systems of individualized exemptions. Rather, if religious animus in the enacting of the law or regulation is shown, that goes to whether the law is a neutral law of general applicability. See *Grace United Methodist*, 451 F.3d at 649-50. Additionally, Stinemetz distinguishes her case from *Grace United Methodist* by noting that there are no limits

on the KHPA's discretion to find medical necessity and grant prior authorization, unlike in *Grace United Methodist*, where the church asked for an exemption that would not exist for a secular organization. In the case at hand, the exemption articulated in K.A.R. 30-5-58(ooo)(1)(E) simply places discretion wholly in the hands of the Secretary or his or her designee.

The United States Supreme Court has yet to explain specifically what constitutes a "system of individual exemptions" for purposes of heightening scrutiny on a claim under the Free Exercise Clause of the First Amendment. However, the Tenth Circuit has limited the exception to "systems that are designed to make case-by-case determinations." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1298 (10th Cir. 2004). See also *Mount St. Scholastica, Inc. v. City of Atchison, Kansas*, 482 F. Supp. 2d 1281 (D. Kan. 2007) (because City had discretion to make case-by-case determinations concerning building demolition, City's decision prohibiting plaintiff from demolishing administration building was subject to strict scrutiny).

Returning to our facts, there is nothing in the language of K.A.R. 30-5-70(c)(2) or any of the Kansas Medicaid regulations to indicate that the regulations either were enacted or are enforced in such a way as to target Jehovah's Witnesses. The regulations are neutral and of general applicability, but the regulations have the incidental effect of burdening Stinemetz' particular religious beliefs. Under the *Employment v. Smith* test, enforcement of the Kansas Medicaid regulations need not be justified by a compelling governmental interest to avoid violating Stinemetz' rights under the Free Exercise Clause of the First Amendment. See 494 U.S. at 878. The *Employment v. Smith* test is the primary test followed today in evaluating claims under the Free Exercise Clause, and under this test, Stinemetz' assertion of her rights under the First Amendment fails.

But even the *Employment v. Smith* test carves out an "individual exemption exception." Under this exception, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." 494 U.S. at 884. The Kansas Medicaid regulations provide for an individual exemption exception under K.A.R. 30-5-

58(ooo)(1)(E), which provides that medical services that do not otherwise meet the definition of medical necessity may still be covered "at the choice of the secretary or the secretary's designee." It appears from the regulations that the Director of the KHPA, who now stands in the shoes of the SRS Secretary, has the absolute discretion on a case-by-case basis to provide coverage for medical services that do not otherwise meet the definition of medical necessity.

Because the Kansas Medicaid regulations allow for an individual exemption on a case-by-case basis in defining medical necessity, the KHPA cannot refuse to extend that exemption to cover Stinemetz' religious hardship without providing a compelling reason. Here, the KHPA has failed to suggest any state interest, much less a compelling interest, for denying Stinemetz' request for prior authorization for the out-of-state liver transplant. Based on the evidence presented by Stinemetz, it appears that the bloodless technique for a liver transplant is less expensive than a procedure involving blood transfusions, which the KHPA is willing to fund. Thus, the KHPA is unable to argue that the agency is being fiscally responsible as the steward of Kansas tax dollars by denying Stinemetz' request for prior authorization for the bloodless liver transplant.

Moreover, according to the evidence submitted by Stinemetz, bloodless transplants are gaining widespread medical acceptance. Dr. Wallace, clinical consultant for the KHPA, testified that if a Kansas medical facility was available to perform a bloodless liver transplant, Kansas Medicaid would pay for the surgery. In fact, under the regulations, Kansas Medicaid would pay for the surgery if there was a medical facility within 50 miles of the Kansas border that could perform the bloodless technique. For instance, Stinemetz would have no difficulty obtaining Kansas Medicaid benefits for a bloodless liver transplant if a medical facility in Kansas City, Missouri, was available to perform the technique. But because the nearest medical facility able to perform Stinemetz' bloodless liver transplant is located in Omaha, the KHPA chooses to strictly follow its regulations and deny the surgery, even though the regulations

allow for an exemption on a case-by-case basis at the discretion of the Director of the KHPA.

Considering all the evidence, the KHPA's decision to deny Stinemetz' request for prior authorization for an out-of-state liver transplant seems arbitrary, even without considering Stinemetz' rights under the Free Exercise Clause of the First Amendment. When Stinemetz' rights under the First Amendment are considered, the result is clear. Based on our review of the record, we conclude that the KHPA's denial of Stinemetz' request for prior authorization for the out-of-state liver transplant violated her rights under the Free Exercise Clause of the First Amendment to the United States Constitution. Although we could end our analysis here, we will also address Stinemetz' claim under § 7 of the Kansas Constitution Bill of Rights.

### STINEMETZ' RIGHTS UNDER THE KANSAS CONSTITUTION

Stinemetz argues that, in addition to violating the Free Exercise Clause of the First Amendment to the United States Constitution, the KHPA's denial of her request for prior authorization violated § 7 of the Kansas Constitution Bill of Rights. Stinemetz argues that under the Kansas Constitution Bill of Rights, this court should apply strict scrutiny to the KHPA's actions, requiring a compelling state interest to uphold the denial of her request for prior authorization for the out-of-state liver transplant.

As we previously stated, the scope of judicial review of a state administrative agency action is defined by the KJRA, K.S.A. 77-601 *et seq*. An appellate court exercises the same limited review as does the district court; it is as though the appeal were made directly to the appellate court. *Powell*, 290 Kan. at 567. As the party asserting the agency's action was invalid, Stinemetz bears the burden of proving its invalidity. K.S.A. 2010 Supp. 77-621(a)(1). Whether a statute or regulation is constitutional as applied is a question of law over which an appellate court has unlimited review. *Laturner*, 289 Kan. at 735

Section 7 of the Bill of Rights of the Kansas Constitution states, in pertinent part:

"The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted, nor any preference be given by law to any religious establishment or mode of worship."

In *State v. Smith*, 155 Kan. 588, 127 P.2d 518 (1942), our Supreme Court addressed the religious exercise rights protected by § 7 of the Kansas Constitution Bill of Rights. We will review the facts of this case in detail. In 1907, the Kansas Legislature passed an act mandating that school authorities at public schools purchase a United States flag and display the flag upon, near, or in the school building during school hours and at times specified by the authorities. In 1919, the legislation was amended to include public, private, and parochial schools. Further, the amendment added a section requiring the county superintendent to notify school authorities of the statute and making it a misdemeanor for school authorities to fail to comply with the statute within 30 days of such notice. 155 Kan. at 589.

The state superintendent subsequently prepared and published a "Manual of Patriotic Instruction," with several pages devoted to the flag code. Specifically, the manual gave instructions on how to properly perform the pledge of allegiance and the salute to the flag. The manual called attention to a recent United States Supreme Court decision that upheld a Nebraska statute identical to one in Kansas, providing penalties for unlawful acts involving the United States flag. 155 Kan. at 590.

At the beginning of the 1941 school year, members of the school board of Cherokee County informed a teacher to exclude any children from school who failed to salute the flag. As a result of this directive, the children of two families in Cherokee County were excluded from school for refusing to salute the flag. The two families were Jehovah's Witnesses and believed that "the flag is a graven image; to worship it is a violation of the command of God and would condemn them." 155 Kan. at 591. Because the children were not permitted to attend school, they were ultimately found guilty of violating the truancy laws. 155 Kan. at 588-89.

The case reached the Kansas Supreme Court at the height of World War II. During that time, patriotism and respect for the American flag enjoyed widespread support among the general public. In arguing that the truancy convictions should be affirmed, the State cited *Minersville District v. Gobitis*, 310 U.S. 586, 60 S. Ct. 1010, 84 L. Ed. 1575 (1940), *overruled by Board of Education v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943), which held that expulsion of children from school because they would not salute the flag was constitutionally permissible under the federal Constitution. Likewise, the *Smith* court interpreted the case before it as turning not on whether the expulsion was permissible under the federal Constitution, but whether the statutes and regulations were valid under the Kansas Constitution. 155 Kan. at 594.

In analyzing the constitutional claims, our Supreme Court compared the relative religious exercise rights protected by § 7 of the Kansas Constitution Bill of Rights to those protected by the First Amendment to United States Constitution and observed "that the wording of this section of our Bill of Rights is much more in detail respecting religious freedom than is the First Amendment to the federal constitution." 155 Kan. at 594. After construing § 7 of the Kansas Constitution Bill of Rights in conjunction with Article 6, § 2 of the Kansas Constitution, which ordered the establishment of a uniform system of common schools, the *Smith* court found that it was unconstitutional under § 7 of the Kansas Constitution Bill of Rights to enforce the applicable Kansas statutes to exclude the children from school for failure to salute the flag. 155 Kan. at 596-97. Thus, the Supreme Court reversed the truancy convictions. 155 Kan. at 597. In addressing the State's argument that the family's religious beliefs were unreasonable, the Supreme Court stated:

"We are not impressed with the suggestion that the religious beliefs of appellants and their children are unreasonable. Perhaps the tenets of many religious sects or denominations would be called reasonable, or unreasonable, depending on who is speaking. It is enough to know that in fact their beliefs are sincerely religious, and that is conceded by appellee." 155 Kan. at 597.

Based on *Smith*, Stinemetz argues that even if the compelling state interest test no longer applies to the Free Exercise Clause of

the First Amendment, this court should still apply strict scrutiny to the KHPA's actions under the Kansas Constitution Bill of Rights. To support this contention, Stinemetz cites *State v. Evans*, 14 Kan. App. 2d 591, 796 P.2d 178 (1990). *Evans* concerned a challenge by a probationer to the conditions of his probation that required church attendance and 1,000 hours of maintenance work at a specific church. Finding that the conditions were an unconstitutional restriction on religious freedom, this court stated:

"The Kansas Constitution contains a strong prohibition against religious coercion. We are persuaded that the standards set in the *Wright* case ought to be applied in Evans' case and that 'only those interests of the highest order' ought to override the free exercise of religion. Lacking a showing of an interest of the highest order, we reverse and remand for resentencing before another judge." 14 Kan. App. 2d at 593.

Our Supreme Court has also read *Evans* to require a compelling state interest to justify imposition of terms that violate a probationer's constitutional rights. See *State v. Bennett*, 288 Kan. 86, 91, 200 P.3d 455 (2009) (citing *Evans* and stating that "Kansas courts have consistently recognized, however, that a district court does not have discretion to impose probationary conditions that violate a probationer's constitutional rights, absent a compelling state interest"). It is important to note that the opinion in *Evans* was issued after the United States Supreme Court's opinion in *Employment Division v. Smith*, so the court in *Evans* could have followed the more permissible analysis in *Employment v. Smith* had it wanted to do so.

Stinemetz also argues that the Kansas and Ohio Constitutions are very similar, and therefore this court should follow Ohio's interpretation of the free exercise protections secured by its constitution. Article I, § 7 of the Ohio Constitution states, in pertinent part:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted."

The similarities between the Ohio Constitution and the language of § 7 of the Kansas Constitution Bill of Rights are not coincidental. In 1859, a constitutional convention met in Wyandotte, Kansas, to frame and adopt a constitution for Kansas. Wyandotte Constitutional Convention 676 (1920). After voting, the members of the convention made the Ohio Constitution the basis for the Kansas Constitution, and copies of the Ohio Constitution were distributed to the drafting committees for the Kansas Constitution. Wyandotte Constitutional Convention, at 677. Other than § 1 and § 6, the Kansas Constitution Bill of Rights is modeled, section by section, upon the Ohio Constitution. Wyandotte Constitutional Convention, at 678.

While there is little Kansas precedent, especially recent precedent, interpreting § 7 of the Kansas Constitution Bill of Rights, the Ohio Supreme Court examined its constitution's free exercise protections post-*Employment v. Smith* in *Humphrey v. Lane*, 89 Ohio St. 3d 62, 728 N.E.2d 1039 (2000). *Humphrey* concerned a prison grooming policy that required short hair length in order " 'to create a unified appearance among uniformed personnel.' " 89 Ohio St. 3d at 69. A guard subscribing to Native American Spirituality, of which a central tenet is that "a man's hair should not be cut unless he is in mourning," challenged the policy as unconstitutionally infringing on the free exercise of his religion. 89 Ohio St. 3d at 68-69. The Ohio Supreme Court quoted the language of Article I, § 7 of the Ohio Constitution and stated that the phrase " 'nor shall any interference with the rights of conscience be permitted' " provided broader religious exercise protection than the language in the federal Constitution. 89 Ohio St. 3d at 67.

Noting that in *Employment v. Smith*, the United States Supreme Court held that if the challenged regulation is a neutral and generally applicable law, the regulation does not violate the Free Exercise Clause of the First Amendment, the Ohio Supreme Court stated that the *Employment v. Smith* decision "marked the divergence of federal and Ohio protection of religious freedom." 89 Ohio St. 3d at 67. The Ohio Supreme Court concluded:

"[T]he Ohio Constitution's free exercise protection is broader, and we therefore vary from the federal test for religiously neutral, evenly applied government ac-

tions. We apply a different standard to a different constitutional protection. We adhere to the standard long held in Ohio regarding free exercise claims—that the state enactment must serve a compelling state interest and must be the least restrictive means of furthering that interest. That protection applies to direct and indirect encroachments upon religious freedom." 89 Ohio St. 3d at 68.

Stinemetz urges this court to follow the reasoning of the Ohio Supreme Court in *Humphrey* and apply a strict scrutiny test to the KHPA's actions under the Kansas Constitution. Under this test, the KHPA's actions must serve a compelling state interest and must be the least restrictive means of furthering that interest in order to avoid infringing upon Stinemetz' rights under the Kansas Constitution.

The KHPA, on the other hand, points out the similarities between the Kansas and Minnesota Constitutions. Article I, § 16 of the Minnesota Constitution Bill of Rights states, in pertinent part:

"The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state, nor shall any money be drawn from the treasury for the benefit of any religious societies or religious or theological seminaries."

The KHPA cites *Shagalow v. State, Dept. of Human Services*, 725 N.W.2d 380 (Minn. App. 2006), *rev. denied* February 28, 2007, as an example of a free exercise challenge to a state Medicaid determination. In *Shagalow*, the plaintiff was a Jewish Orthodox woman who was diagnosed with a developmental cognitive disorder and attention deficit hyperactivity disorder, leaving her dependent on others to make legal and medical decisions, and to assist her with grooming and other everyday tasks. As the plaintiff approached her high school graduation, her family began searching for a habilitation program in which she could learn and develop living skills but that was also compatible with her Jewish Orthodox faith. No such program existed in Minnesota or elsewhere in the

United States, and the only program the plaintiff's family could locate was in Jerusalem, Israel.

The plaintiff requested, through the appropriate administrative agency, that she receive financial support for habilitation services in Israel as part of Minnesota's Medicaid program. The State denied her request, and that denial was upheld at the appropriate levels of review. After addressing the propriety of the denial under applicable state law, the Minnesota Court of Appeals addressed the constitutional claims. Addressing the claims under the federal Constitution, the court noted:

"Federal cases interpreting the religion clauses establish that neutral laws of general applicability do not run afoul of the First Amendment, even if they incidentally burden an individual's religious conduct. [Citation omitted.] Such neutral, generally applicable laws 'need not be justified by a compelling governmental interest.' [Citation omitted.] But a law that is not neutral or generally applicable 'must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest,' even if it only incidentally burdens an individual's free exercise. [Citation omitted.]" 725 N.W.2d at 388.

The Minnesota court recognized that *Employment v. Smith* did not expressly overrule the strict scrutiny analysis of *Sherbert* and other unemployment compensation cases and that federal courts continue to use an individualized exemption exception to the rule in that case. 725 N.W.2d at 389. Nevertheless, the court found that the denial of financial support for the services in Israel "was religiously neutral," that the agency's action was "not motivated by a desire to harm, restrict, or burden appellant's exercise of her religious faith," that the denial "was neither related to nor did it proscribe appellant's practice of her Orthodox Jewish faith," and that the basis for the denial was to permit effective monitoring of the quality, health, and financial integrity of medical services. 725 N.W.2d at 389. Therefore, the Minnesota Court of Appeals found that the "decision was neutral and generally applicable and does not violate the United States Constitution." 725 N.W.2d at 389.

The KHPA argues that Minnesota law—presumably that in *Shagalow*—is better developed on constitutional free exercise protections than Kansas law, and therefore this court should follow the Minnesota Court of Appeals' interpretation of the constitutional

protections. The KHPA argues that *Shagalow* adopts the United States Supreme Court's test in *Employment v. Smith*, examining whether the challenged law is a neutral and generally applicable law designed without religious animus.

Although the result in *Shagalow* supports the KHPA's position, the court's analysis in that case favors Stinemetz' position. The *Shagalow* court applied the *Employment v. Smith* test in addressing the plaintiff's claims under the federal Constitution, but the court did not use this same test for its analysis under the Minnesota Constitution. Rather, the *Shagalow* court applied a four-step test in analyzing the plaintiff's rights under the Minnesota Constitution, including examining whether the State had a compelling interest to deny the plaintiff's request for benefits and whether the State used the least restrictive means to serve that interest. 725 N.W.2d at 390-92.

Essentially, the *Humphrey* and *Shagalow* courts both used the same analysis in interpreting the religious protections guaranteed by their respective state constitutions. In *Shagalow,* the court stated:

"To determine whether government action violates an individual's right to religious freedom we ask: (1) whether the belief is sincerely held; (2) whether the state action burdens the exercise of religious beliefs; (3) whether the state interest is overriding or compelling; and (4) whether the state uses the least restrictive means. [Citations omitted.] Appellant has the burden under the second prong of this test to show that the government's actions burdens her exercise of religious beliefs, and then the burden shifts to the state to justify its interest as compelling and show that it has chosen the least restrictive means by which to achieve its goal. [Citation omitted.]" *Shagalow*, 725 N.W.2d at 390.

We agree with both Stinemetz and the KHPA that we should look to the Ohio and Minnesota courts for guidance because the provisions of their respective state constitutions on religious liberties are similar to § 7 of the Kansas Constitution Bill of Rights. We find the *Shagalow* decision championed by the KHPA to be the most instructive case, and we adopt its four-step test to determine whether state action unconstitutionally infringes on the free exercise of religion under § 7 of the Kansas Constitution Bill of

Rights. We will now apply this four-step test to Stinemetz' request for prior authorization for the out-of-state liver transplant.

The burden is on Stinemetz to satisfy the first two steps. The first step is whether Stinemetz' religious beliefs are sincere. Stinemetz testified at length at the administrative hearing that she had been a Jehovah's Witness for over 35 years and was refusing the blood transfusion because of her religious beliefs. She quoted numerous passages from the Bible on which she based her belief that blood transfusions are prohibited. The district court expressly found that Stinemetz' request for a bloodless liver transplant was based on her sincere and deeply held religious belief. This finding is supported by substantial and overwhelming evidence in the record. On appeal, the KHPA makes no attempt to challenge this finding. Thus, Stinemetz has satisfied the first step of the test.

The second step is whether the KHPA's action burdens Stinemetz' free exercise of her religious beliefs. The KHPA attempts to challenge this step by pointing to Stinemetz' own testimony that if she received a blood transfusion against her religious beliefs, she would still be allowed to be a member of her congregation if she was truly repentant for what she had done. Based on this testimony, the KHPA's brief argues that Stinemetz presented "no evidence that [KHPA's] decision concerning the prior authorization for a bloodless liver transplant caused an infringement on Jehovah's Witnesses as a church or on [Stinemetz'] practice or understanding of her religion."

The KHPA's reliance upon these factors is misplaced. Under this step of the analysis, Stinemetz need not show that she altered her faith because of the KHPA's actions or that receiving a blood transfusion would be an unforgiveable sin. Here, Stinemetz was offered the choice of undergoing a financially reimbursable liver transplant with blood transfusions, which are prohibited by her religion, or paying out-of-pocket for a bloodless liver transplant that would comport with her religious beliefs. Conditioning the provision of a life-saving public benefit on Stinemetz agreeing to engage in conduct which violates her deeply held religious beliefs constitutes a heavy burden on her free exercise of religion. Thus, Stinemetz has satisfied the second step of the test.

The third step of the test shifts the burden to the KHPA to show a compelling or overriding state interest to support its decision. The KHPA has failed to show any state interest, much less a compelling interest, for denying Stinemetz' request for prior authorization for the out-of-state liver transplant. As discussed earlier in this opinion, there is no question that the KHPA would authorize a liver transplant for Stinemetz in Kansas, including a bloodless liver transplant if a medical facility was available in Kansas to perform the technique. Because there is no such medical facility in Kansas, Stinemetz is requesting Medicaid to honor her religious principles and pay for the procedure out-of-state. Cost is not the issue. The available evidence indicates that the bloodless technique is less expensive than a procedure involving blood transfusions. The available evidence indicates that a bloodless liver transplant is a medically accepted technique offered by several medical facilities in other states, including the Nebraska Medical Center in Omaha and at the University of Oklahoma. Thus, the KHPA has failed to satisfy the third step of the test.

Because the KHPA has offered no evidence of a compelling state interest to support its decision, it follows that the KHPA has not proposed the least restrictive means of achieving its interest. Thus, the KHPA has failed to satisfy the fourth step of the test.

As a Kansas citizen, Stinemetz is protected by the provisions of the Kansas Constitution, which provides even greater protection of the free exercise of her religious beliefs than the First Amendment to the United States Constitution. Applying the four-step test to the evidence presented in this case, we conclude that the KHPA's denial of Stinemetz' request for prior authorization for the out-of-state liver transplant violated her rights under § 7 of the Kansas Constitution Bill of Rights.

## CONCLUSION

There is nothing in the language of K.A.R. 30-5-70(c)(2) or any of the Kansas Medicaid regulations to indicate that the regulations either were enacted or are enforced in such a way as to target Jehovah's Witnesses. The regulations are neutral and of general applicability, but the regulations have the incidental effect of bur-

dening Stinemetz' particular religious beliefs. Under the *Employment v. Smith* test, enforcement of the Kansas Medicaid regulations need not be justified by a compelling governmental interest to avoid violating Stinemetz' rights under the Free Exercise Clause of the First Amendment.

But even the *Employment v. Smith* test carves out an "individual exemption exception." Under this exception, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without a compelling reason." 494 U.S. at 884. Because the Kansas Medicaid regulations allow for an individual exemption on a case-by-case basis in defining medical necessity, the KHPA cannot refuse to extend that exemption to cover Stinemetz' religious hardship without providing a compelling reason. Here, the KHPA has failed to suggest any state interest, much less a compelling interest, for denying Stinemetz' request for prior authorization for the out-of-state liver transplant. For this reason, the KHPA's decision violated Stinemetz' rights under the Free Exercise Clause of the First Amendment to the United States Constitution.

Stinemetz has even greater protections concerning the free exercise of religious beliefs under § 7 of the Kansas Constitution Bill of Rights than under the federal Constitution. To determine whether government action violates an individual's right to the free exercise of religious beliefs under the Kansas Constitution, a court must determine: (1) whether the individual's religious beliefs are sincerely held; (2) whether the state action burdens the individual's free exercise of religious beliefs; (3) whether the state interest is overriding or compelling; and (4) whether the State uses the least restrictive means of achieving its interest. Under this four-step test, the KHPA's denial of Stinemetz' request for prior authorization for the out-of-state liver transplant violated her rights under § 7 of the Kansas Constitution Bill of Rights.

We conclude that the KHPA's denial of Stinemetz' request for prior authorization for the out-of-state liver transplant violated her rights under the Free Exercise Clause of the First Amendment to the United States Constitution as well as her rights under § 7 of the Kansas Constitution Bill of Rights. The judgment of the district

court is reversed and the case is remanded with directions that the KHPA grant Stinemetz' request for prior authorization for the out-of-state liver transplant.

Reversed and remanded with directions.